**DOOLIN SECURITY SAVINGS BANK, F.S.B., Petitioner,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Respondent.**

No. 94–1877.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 5, 1994.

Decided May 18, 1995.

**ARGUED:** John Charles Deal, Emens, Kegler, Brown, Hill & Ritter, Columbus, OH, for petitioner. Barbara Susanne Woodall, F.D.I.C., Washington, DC, for respondent. **ON BRIEF:** Anthony C. White, Emens, Kegler, Brown, Hill & Ritter, Columbus, OH, for petitioner. Ann S. DuRoss, Asst. Gen. Counsel, Robert D. McGillicuddy, Sr. Counsel, Marta W. Berkley, F.D.I.C., Washington, DC, for respondent.

Before RUSSELL and MICHAEL, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Affirmed by published opinion. Judge DONALD RUSSELL wrote the opinion, in which Judge MICHAEL and Senior Judge PHILLIPS joined.

## OPINION

DONALD RUSSELL, Circuit Judge:

Doolin Security Savings Bank, F.S.B. (Doolin), appeals a decision by the Board of Directors of the Federal Deposit Insurance Corporation (Board) to terminate Doolin's insured status. We affirm.

### I.

Doolin is a federally chartered savings association, with its principal place of business

in New Martinsville, West Virginia. As an "insured depository institution" under the Federal Deposit Insurance Act (FDIA), 12 U.S.C. § 1813(c)(2), Doolin has two regulators: the Office of Thrift Supervision (OTS), which is Doolin's primary federal regulator, and the Federal Deposit Insurance Corporation (FDIC), which has supplemental authority. Doolin pays its deposit insurance assessments to the FDIC under section 7 of the FDIA, 12 U.S.C. § 1817(c)(2), and under 12 C.F.R. § 327.3 (1994).[1] The FDIC then credits the assessments to the Savings Association. Insurance Fund (SAIF).

By letter dated December 1, 1992, the FDIC notified Doolin that it had assigned Doolin an assessment risk classification of "1B" for purposes of determining its annual deposit insurance rate for the six month period beginning January 1, 1993. The notification called for an assessment of $40,651.53, due and payable on January 31, 1993. Doolin believed that its risk classification should have been "1A" rather than "1B," which would have reduced its assessment to $32,677.37.[2] Doolin asserted that the FDIC classification was erroneous because in assigning the classification, the FDIC relied in part on a 1992 OTS examination report and composite rating of Doolin, which Doolin believed were also erroneous.[3]

Doolin thus paid the FDIC $32,677.37 in January 1993 and withheld the difference. Along with its payment, Doolin submitted an altered version of its certified statement, on which Doolin substituted an annual assessment rate corresponding to a 1A classification. The FDIC notified Doolin on May 18 and July 14, 1993, that it had failed to pay its full semiannual assessment due on January 31, 1993.

The next semiannual assessment of $67,-519.24 was due and payable on July 31, 1993. In July 1993, Doolin paid only $59,728.68, again based on its calculation of its assessment as if it had been classified as 1A. Doolin also submitted a second certified statement altered to correspond to a 1A classification. From its two underpayments, Doolin withheld a total of $15,764.80 of its deposit insurance assessment for 1993.

By letter dated September 14, 1993, the FDIC informed Doolin that it had notified the OTS of Doolin's underpayment of insurance premiums and that it would likely proceed under section 8(a) of the FDIA, 12 U.S.C. § 1818(a), to terminate Doolin's insured status unless Doolin remitted the full amount of the insurance premiums assessed. When Doolin continued to contest its risk classification, the FDIC formally began enforcement proceedings on November 18, 1993, pursuant to 12 U.S.C. § 1818(a)(2)(B), by issuing Doolin a Notice of Intention to Terminate its Insured Status, Findings, and Order Setting Hearing. The Notice stated that Doolin had failed to pay the full amount of its semiannual assessments for 1993 in violation of section 7(c)(1) of the FDIA, 12 U.S.C. § 1817(c)(1), and 12 C.F.R. § 327.3. On November 24, 1993, Doolin filed its answer and request for a jury trial.

The FDIC moved for summary disposition with the ALJ on January 19, 1994, pursuant to 12 C.F.R. § 308.29. Under § 308.29(a), the ALJ shall recommend a final order granting such motions when there exists "no genuine issue as to any material fact" and "[t]he

---

1. In an FDIC rule promulgated December 20, 1994, and effective April 1, 1995, the FDIC renumbered § 327.3 as § 327.4. 59 Fed.Reg. 67153, 67161–63 (Dec. 29, 1994).

2. The rating Doolin received was the second best among nine possible ratings. A "1B" classification corresponded to an annual assessment of $0.26 for each $100.00 of domestic deposits. Institutions classified as "1A," the categorization Doolin believes is appropriate, pay an annual assessment of $0.23 for each $100.00 of domestic deposits. The parties do not raise the issue that the ratio of 0.23 to 0.26 does not equal the ratio of 32,677.37 to 40,651.53, but we assume for

purposes of this appeal that Doolin's calculations were correct at the 1A rating.

3. The FDIC's assessment regulations provide that "each institution will be assigned to one of the three subgroups based on the [FDIC's] consideration of the supervisory evaluations provided by the institution's primary federal regulator.... In addition, the [FDIC] will take into consideration such other information (such as state examination findings, if appropriate) as it determines to be relevant to the institution's financial condition and the risk posed to the ... SAIF." 12 C.F.R. § 327.3(e)(1)(ii).

moving party is entitled to a decision in its favor as a matter of law." Finding "no *material* facts in genuine issue," the ALJ issued an order on February 24, 1994, recommending summary disposition in favor of the FDIC. Joint Appendix (JA) at 295 (emphasis in original). The ALJ primarily found that Doolin had not paid its required semiannual assessments and that it was in violation of 12 U.S.C. § 1817(c)(1) and 12 C.F.R. § 327.3. The ALJ also held that his recommendation mooted Doolin's outstanding document requests on the FDIC. Doolin filed exceptions to the recommended decision on March 25, 1994.

On June 29, 1994, the FDIC Board of Directors adopted the ALJ's recommended decision, making additional findings and conclusions, and issued its final Decision and Order to terminate Doolin's insured status on summary disposition. The Board found that section 8(a) of the FDIA, 12 U.S.C. § 1818(a), authorized the FDIC to terminate the deposit insurance of an insured depository institution that violates applicable law and that Doolin violated applicable law by not paying its full insurance assessment. The Board also concluded that summary disposition was appropriate because there were no genuine issues of material fact.[4]

Doolin's primary dispute before the ALJ and the Board centered on its 1B risk classification assignment and the lawfulness of the procedures by which the FDIC determined that classification. The ALJ concluded that review of those issues was not proper in this proceeding, and the Board agreed, reasoning that Doolin's disagreement with the assessment classification was in fact a basic disagreement with the OTS examination report.[5] The Board noted that Doolin was engaged in an effort to have the OTS modify its 1992 examination report but that Doolin had yet to be successful. The Board concluded that Doolin may not use this termination of insurance proceeding to circumvent its dispute with the OTS.

The Board also addressed Doolin's several other challenges to the FDIC's action. The Board rejected Doolin's contention that the FDIC should have sued in federal court to recover its unpaid assessment, rather than initiate this administrative proceeding. The Board also reasoned that the FDIC had acted reasonably in determining to rely, in part, on subjective reports of primary regulators in developing the risk-based assessment scheme. The Board further concluded that Doolin had received due process under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* Finally, the Board rejected Doolin's suggestion that the FDIC could not make an objective determination of whether to maintain Doolin's 1B classification because the FDIC is institutionally biased based on its pecuniary interest in maintaining the insurance fund. Doolin filed a petition for review in this Court on July 8, 1994. By an order dated July 21, 1994, this Court stayed the FDIC Order pending review.

## II.

The applicable standard under 12 U.S.C. § 1818(h)(2) requires review "as provided in chapter 7 of Title 5 [of the APA]." Under this standard of review:

> [T]his Court, in its review of the final agency action, cannot reverse the FDIC Board action unless the findings upon which it is based are not supported by substantial evidence on the record as a whole, or unless the remedies formulated by the Board constitute an abuse of discretion or are otherwise arbitrary and capricious.

*Sunshine State Bank v. FDIC,* 783 F.2d 1580, 1584 (11th Cir.1986); *see also Bullion v. FDIC,* 881 F.2d 1368, 1372–73 (5th Cir. 1989) (adopting the same standard for review under § 1818(h)(2) for civil penalty hearings

4. During the Board's review proceedings, Doolin contested factual issues principally related to the OTS composite rating and the FDIC classification based, in part, on this OTS rating. We agree with the Board's decision that these factual concerns are not material to the FDIC's decision to terminate insurance.

5. The Board never determined whether Doolin's "1B" classification was erroneous. *See* JA at 309 (Board decision at 5 n. 5).

regarding violations of 12 U.S.C. § 1828(j)(4)(D)).

## III.

On appeal, Doolin concedes that it underpaid its assessments and thus admits to the material facts that supported the Board's conclusion that Doolin had committed a violation warranting the termination of its insured status. Doolin, however, presents numerous challenges to the Board's decision and raises several issues regarding the legality of the FDIC risk-based assessment scheme and procedural structure under which the FDIC sought to terminate Doolin's insured status. The FDIC promulgated regulations governing the risk-based assessment scheme in 1992 and 1993, and our analysis of these regulations represents a case of first impression in this Circuit. We thus proceed to address Doolin's legal arguments contesting the FDIC's risk-based assessment scheme and its accompanying procedures.

In essence, Doolin's challenges can be grouped into objections based on: (1) the reasonableness of the FDIC's interpretation of the Federal Deposit Insurance Corporation Improvement Act of 1991 (FDICIA), Pub.L. No. 102–242, 105 Stat. 2236, in establishing the risk-based assessment scheme; (2) the constitutionality of existing FDIC procedures under which insured depository institutions challenge their assessment risk classifications; and (3) the authority of the FDIC to institute an administrative proceeding to terminate Doolin's insured status, as opposed to an action in federal district court.

## A.

Doolin first challenges the lawfulness of the FDIC regulations under 12 C.F.R. § 327.3, which establish the FDIC's risk-based assessment scheme. Specifically, Doolin argues that the risk-based assessment regulations are inconsistent with the FDICIA because the regulations allow the FDIC to use subjective, bank-by-bank evaluations, such as those contained in primary regulator examination reports, in determining the assessment risk classification for depository in-

stitutions. Doolin contends that Congress intended that the FDIC create a risk-based system that would employ only objective mathematical calculations based upon the periodic financial statements filed by depository institutions.

During its first 60 years, the FDIC assessed insured institutions at the same flat rate for coverage. In 1991, however, the FDICIA established a risk-based assessment system under which the premiums paid by federally insured financial institutions are based on the risks the institutions pose to the insurance fund. Section 302(a) of the FDICIA requires the FDIC to establish final risk-based assessment regulations, and § 302(f) authorizes the FDIC to promulgate transitional regulations governing the time period between the flat-rate assessment system and the risk-based assessment system required under § 302(a). The FDIC adopted the transitional regulations on September 15, 1992, 57 Fed.Reg. 45263 (Oct. 1, 1992), and subsequently adopted the final regulations on June 17, 1993, 58 Fed.Reg. 34357 (June 25, 1993). Both regulations were codified under 12 C.F.R. § 327. The transition regulations were in effect from January 1, 1993, to January 1, 1994, the time during which Doolin withheld portions of its assessments at issue.[6]

In § 302(a) of the FDICIA, Congress defined a "risk-based assessment system" as:

a system for calculating a depository institution's semiannual assessment based on—

(i) the probability that the deposit insurance fund will incur a loss with respect to the institution, taking into consideration the risks attributable to—

(I) different categories and concentrations of assets;

(II) different categories and concentrations of liabilities, both insured and uninsured, contingent and noncontingent; and

(III) any other factors the [FDIC] determines are relevant to assessing such probability;

---

6. The minor differences between the transitional and the final regulations do not affect our deci-

sion regarding whether the regulations represent a reasonable interpretation of the FDICIA.

(ii) the likely amount of any such loss; and

(iii) the revenue needs of the deposit insurance fund.

12 U.S.C. § 1817(b)(1)(C). Doolin emphasizes certain words in the statute, such as "risk-based," "system," and "categories," and cites certain legislative history to contend that Congress intended that the FDIC use only objective criteria in developing a risk-based assessment system. Doolin's documents offered to demonstrate "legislative history," however, do not sufficiently reflect congressional intent prohibiting the FDIC from employing subjective factors in developing the system.[7] More importantly, Doolin's selective emphasis on certain words in the FDICIA cannot detract from the fact that the statute expressly gives the FDIC considerable discretion by allowing the FDIC to consider "any other factors the [FDIC] determines are relevant" in calculating an institution's semiannual assessment. *Id.*

■ In reviewing an agency's interpretation of a statute it administers, a court affords the interpretation "substantial deference" whenever the interpretation "provides a reasonable construction of the statutory language and is consistent with legislative intent." *Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys.*, 468 U.S. 207, 217, 104 S.Ct. 3003, 3009, 82 L.Ed.2d 158 (1984). The reviewing court should inquire only into whether the agency's construction was " 'sufficiently reasonable' to be accepted by a reviewing court." *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). Furthermore, when a reviewing court is confronted with a silent or ambiguous statutory provision, such as the FDICIA's broad description of the risk-based assessment system, the court must defer to any reasonable interpretation of the statute by the agency designated to administer the law. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *Kennedy v. Shalala*, 995 F.2d 28, 30 (4th Cir.1993).

In determining that the existing FDIC scheme was reasonable, the Board recognized the benefits of employing the long-established OTS primary regulatory system and of avoiding duplicative examination procedures solely for the purposes of FDIC insurance assessment. The Board reasoned that such a duplicative process would be "contrary to Congressional intent in this time of reduction of regulatory paperwork and intrusion." JA at 314 (Board decision at 10).

■ Given the inclusive language in the FDICIA and the FDIC's policy rationale, we conclude that the FDIC reasonably interpreted the FDICIA in establishing an assessment scheme allowing the FDIC to consider subjective factors, such as the supervisory reports by primary regulators. The statute specifically grants the FDIC the authority to consider "relevant" factors, and we decline to hold unreasonable the FDIC's conclusion that the subjective supervisory reports of primary regulators are relevant to determining whether an institution would cause the insurance fund to incur a loss.[8]

### B.

Doolin next argues that the procedures under the FDIC's risk-based regulations are invalid for three principal reasons.

---

7. Doolin's "legislative history" suffers from several infirmities. For instance, Doolin cites a Treasury Department Report as demonstrating congressional intent, but no congressional committee adopted or incorporated the report in reporting on the FDICIA.

8. To support its argument that the FDIC may not lawfully rely on OTS examinations, Doolin cites a report from the General Accounting Office (GAO) that found that the OTS and the FDIC disagreed on the composite ratings in 9 out of the 20 thrifts the GAO examined. JA at 127 (General Accounting Office, *Thrift Examination Quality: OTS Examinations Do Not Fully Assess Thrift Safety and Soundness*, GAO/AFMD–93–11, at 36 (1993)). Although this report highlights an inconsistency between FDIC and OTS determinations, this report does not detract from the explicit congressional provision allowing the FDIC to consider any factors it deems relevant in assigning risk classifications. This Court is not a policymaking body designed to appraise the propriety of the FDIC's decision to rely on OTS reports.

### 1. *FDIC termination of insurance proceedings*

■ First, Doolin asserts that the procedures in this case failed to comply with the APA because this case was decided before the ALJ on summary disposition and Doolin was not granted a formal hearing. The FDIA explicitly provides that formal APA procedures apply to cases concerning the termination of insurance. 12 U.S.C. § 1818(a)(3). Doolin's argument that the hearing requirement was not satisfied in this case mistakenly overlooks the fact that the FDIC conducted a formal adjudication under Chapter 5 of the APA, 5 U.S.C. § 554, but that this action was decided on summary disposition because no material facts regarding Doolin's assessment payments were at issue.[9] Thus, regardless of whether Doolin had a legitimate challenge to its 1B classification or whether the FDIC should have granted Doolin an evidentiary hearing in which to challenge the classification, Doolin's failure to pay its full assessment was uncontroverted and its outstanding discovery requests were properly denied as moot.[10] We thus conclude that the FDIC's procedures reviewing Doolin's termination of insurance complied with the APA.

### 2. *FDIC procedures to review assessment risk classifications*

More significantly, Doolin presents underlying challenges to the FDIC's procedures by which an institution seeks review of its assessment risk classification. Although this appeal directly involves the FDIC's termination of Doolin's insured status, these challenges remain fundamental because Doolin's termination of insurance stems directly from its beliefs regarding its risk classification. Doolin first objects to the fact that the regulations provide for no formal adjudication under the APA in which it could contest its risk classification. Under 12 C.F.R. § 327.3(g), the FDIC established an informal administrative review process through which an institution can challenge its risk classification. An institution must submit a written request for review within 30 days of the date of the letter notifying the institution of its assessment risk classification, and the institution must include documentation sufficient to support the reclassification the institution is seeking. The FDIC intended this process to be a written review procedure in which oral presentations would be permitted only at the FDIC's discretion.[11]

Doolin did, at least initially, take advantage of these informal FDIC review procedures.[12] After the FDIC notified Doolin of

9. Regarding this contention, it is important to emphasize that the procedure at issue specifically involved Doolin's termination of insurance and not the determination of its risk classification. This distinction is important because the FDIA provision requiring formal APA procedures, 12 U.S.C. § 1818(a)(3), applies to the termination of insurance and not to the determination of an institution's risk classification.

10. We similarly reject Doolin's argument that the FDIC's procedures were unlawful because Doolin did not have an adequate opportunity for discovery. Because no issue of material fact remained, we need not address whether the FDIC's regulations improperly prohibited Doolin from conducting depositions.

11. At the time of the assessments at issue, § 327.3(f) of the transitional regulations included a sentence stating that "[a] request for review may include a request for an informal hearing." 12 C.F.R. § 327.3(f) (predecessor to § 327.3(g) in the final regulations), *quoted in* 57 Fed.Reg. 45263, 45285 (Oct. 1, 1992). In adopting the final regulations pursuant to § 302(a) of the FDICIA, the FDIC deleted that sentence and the word "hearing" in the last sentence of the same

provision. The FDIC reasoned, that under the amendments, "the review process, which was designed predominantly as a written procedure, would remain virtually unchanged." 57 Fed. Reg. 34357, 34358–59 (June 25, 1993). The FDIC added that an institution would retain the opportunity under the amendments for an oral presentation at the FDIC's discretion. *Id.* at 34359. Given the FDIC's interpretation of the omission of the reference to a hearing, we conclude that this textual difference between the transitional and final regulations does not affect our decision regarding whether the FDIC review procedures are constitutional.

12. Doolin petitioned the FDIC even though it had not paid its full insurance assessment. After Doolin instituted its review process, the FDIC amended its transitional regulations and enacted the final regulations pursuant to § 302(a) of the FDICIA. The final regulations added a provision, effective October 1, 1993, that requires institutions to make timely payment of their assessments, regardless as to whether the institution has requested review of its risk classification. 12 C.F.R. § 327.3(e)(2). We need not address the constitutionality of this requirement in the final

its 1B classification Doolin requested review of its classification pursuant to 12 C.F.R. § 327.3. Doolin also petitioned the FDIC for an evidentiary hearing on the matter. The FDIC denied Doolin's request for a change in classification and request for a hearing by a letter dated March 25, 1993. Doolin appealed the decision to the FDIC Supervision Review Committee. By letter of July 7, 1993, the Committee also denied Doolin's requests. Doolin did not seek APA judicial review of the Committee's decision.

■ As the Board concluded, Doolin's argument that the APA requires formal APA hearings lacks merit because neither the FDICIA nor FDIC regulations provide for such a formal hearing. The APA creates no greater rights to a formal hearing, where, as here, the statute and regulations do not provide a hearing on the record. *See* 5 U.S.C. § 554(a) (Formal hearing requirements are limited to adjudications "required by statute to be determined on the record after opportunity for an agency hearing.").

■ However, although the statute and regulations do not require a formal APA hearing, Doolin may nevertheless be entitled to a predeprivation hearing under Fifth Amendment due process, and Doolin accordingly argues that these informal FDIC procedures violate its due process rights. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). "[D]ue process is flexible and calls for such procedural protections as the particular situation

demands." *Id.* at 334, 96 S.Ct. at 902 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)). From these principles, the Supreme Court in *Mathews* developed a three-factor inquiry that courts use to determine what type of procedures due process requires before the government deprives an entity of property interest protected under the Due Process Clause of the Fifth or Fourteenth Amendment: [13]

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903.

Applying the *Mathews* inquiry, the Fifth Circuit in *FDIC v. Bank of Coushatta*, 930 F.2d 1122 (5th Cir.), *cert. denied*, 502 U.S. 857, 112 S.Ct. 170, 116 L.Ed.2d 134 (1991), analyzed whether the FDIC's procedures for issuing capital directives satisfied due process. Under the procedures at issue in *Coushatta*, the FDIC notifies the financial institution of its intent to issue a capital directive and provides detailed underlying data in the notification. Upon receipt of the notification, a financial institution may file a written response with supporting data within 14 days. The procedures then require the FDIC to consider the response and issue a

---

regulations because Doolin obtained administrative review of its risk classification under the transitional regulations. We note, however, *Republic Indus., Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund*, 718 F.2d 628, 641–42 (4th Cir.1983) (holding that employer participating in multiemployer benefit plan would not be denied due process in having to pay withdrawal liability installment payments pending review of withdrawal liability), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984).

13. Procedural due process specifically imposes constraints on governmental actions depriving individuals of a "liberty" or "property" interest. *Mathews*, 424 U.S. at 332, 96 S.Ct. at 901. We proceed to address the constitutionality of the FDIC's procedures as if Doolin has a property interest in it risk classification assignment because its classification ultimately affects its deposit insurance assessment rate. However, the parties have not briefed the issue of whether institutions, as a general rule, have a protectible property interest in their risk classification assignments, and we expressly decline to make such a holding.

written determination addressing the response and establishing findings and conclusions supporting its decision to issue or not to issue a directive. *Id.* at 1130 (discussing 12 C.F.R. § 325.6).

In applying the *Mathews* test to the procedures, the Fifth Circuit concluded that the procedures satisfied due process. The court reasoned that the private interest of accurate capital directives is significant but that the risk of an erroneous deprivation is marginal. The court noted that a predeprivation hearing was not warranted because a bank has adequate opportunity to respond to the notice through the written procedures. Finally, the court found that the government's interest is substantial because delay would considerably weaken the benefits from a prompt directive, which seeks to rectify a bank's troubling undercapitalization. *Id.* at 1131.

We similarly find that the FDIC's risk classification review procedures satisfy procedural due process. Doolin's interest in its risk classification is significant because the classification affects its depository insurance assessment rate. The risk of an erroneous deprivation, however, is minimal. As with the capital directive procedures at issue in *Coushatta,* the FDIC's risk classification is based on a detailed, expert evaluation of the financial condition of an institution. The FDIC's regulations require the agency to analyze objective "capital" factors as well as subjective "supervisory" factors.[14] The regulations provide that the FDIC will assign an institution a supervisory subgroup based on the FDIC's "consideration of supervisory evaluations provided by the institution's primary federal regulator." 12 C.F.R. § 327.3(e)(1)(ii). Furthermore, the classification review procedures are at least as sophisticated as the procedures at issue in *Coushatta.* The procedures in this case allow Doolin

to submit its request and supporting documentation to the FDIC Division of Supervision. The procedures also provide for an opportunity to request an informal oral hearing, which the FDIC will grant, in its discretion, "when the Division of Supervision determines that an informal oral presentation would be productive under the applicable circumstances." 58 Fed.Reg. 34357, 34359 (June 25, 1993).[15]

Doolin does not offer sufficient evidence demonstrating that an oral hearing would allow it to present evidence to challenge its risk classification that it could not present in the written review procedure. Like the determination of social security benefits at issue in *Mathews,* 424 U.S. at 344–45, 96 S.Ct. at 907–08, Doolin's risk classification determination did not involve credibility assessments, which would benefit from an oral hearing with the presentation of witnesses. Furthermore, Doolin's allegation of error stems from its belief that the OTS examination report and composite rating were erroneous. The FDIC's review procedures outlined in Enclosure II included in Doolin's notification of its assessment risk classification specifically state that review is "generally available for instances in which the institution's supervisory subgroup assignment *differs* from what would be likely considering the composite rating most recently assigned and communicated to the institution in writing by its primary federal regulator." JA at 220. We thus find no reason to conclude that more extensive review procedures within the FDIC would reduce any risk of erroneous classification.

■ Finally, regarding the third factor under *Mathews,* the public's interest in expeditious classification review procedures is considerable. The FDIC is charged with the difficult task of administering the SAIF, and the SAIF depends on the institutions' assessments and the interest those assessments

---

**14.** The capital factors determine the institution's "capital group," signified as a 1, 2, or 3 in the risk classification. The supervisory risk factors determine the institution's "supervisory subgroup," signified as an A, B, or C in the risk classification. 12 C.F.R. § 327.3(e)(1).

**15.** As mentioned in footnote 11, *supra,* Doolin's review was governed by the transitional regulations, which explicitly allowed for requests for

oral hearings. The final regulations do not contain specific language allowing such a request, but in the Federal Register notification for the final regulations, the FDIC made the statement noted in the text that an institution would retain the opportunity for an oral presentation at the FDIC's discretion. 57 Fed.Reg. 34357, 34359 (June 25, 1993).

earn to enable the FDIC to handle any crisis that might arise due to financial institution failure. The administrative burden and other societal costs associated with requiring a hearing each time an institution challenged its classification would substantially burden the FDIC. As the Supreme Court has reasoned, "At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost." *Mathews,* 424 U.S. at 348, 96 S.Ct. at 909. Moreover, we note that the essence of due process is satisfied when a person is given "notice of the case against him and opportunity to meet it." *Id.* (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 171–72, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)); *see also Bowens v. North Carolina Dep't of Human Resources,* 710 F.2d 1015, 1019 (4th Cir.1983). The FDIC procedures provided Doolin with notice of its risk classification and an opportunity to challenge the classification through the review procedures established in 12 C.F.R. § 327.3. We hold that due process does not require an institution to have predeprivation evidentiary hearing before the final assignment of an assessment risk classification.

We also find that the FDIC's procedures to review assessment risk classifications satisfy due process because Doolin could have sought APA judicial review of the decision of the FDIC Supervisory Review Committee. The FDIC Board relied on this opportunity for judicial review in its decision:

> Administrative review of FDIC assessments may be had pursuant to 12 C.F.R. § 327.3(f). Judicial review of the final agency determination then is available in the United States District Court pursuant to Chapter 7 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* The Board will not allow Respondent to sidestep these procedures and raise questions about determinations of its primary regulator or the underlying insurance assessment in a section 8(a) [termination of insurance] proceeding.

JA at 310 (FDIC Board Decision at 6); *see* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.").

Doolin contends that seeking monetary relief from the FDIC in a district court action would cast it "into [a] jurisdictional thicket" because Doolin would confront several legal barriers, such as immunity concerns, in the action. Petitioner's Reply Br. at 7. Doolin's concerns surrounding the sufficiency of a district court action stem from its implication that it would not be able to obtain monetary damages under the due process clause for the FDIC's "constitutional or statutory violations," presumably flowing from the FDIC's assessing Doolin a faulty risk classification. *Id.* at 8.

Doolin's arguments are flawed because they assume that Doolin is entitled to monetary compensation for an incorrect risk classification assignment in addition to its regulatory remedy of a full refund of any overpayment with interest should a court hold the FDIC's classification arbitrary and the FDIC change its classification. 12 C.F.R. §§ 327.3(e)(2), 327.7(a)(2). Doolin would thus not face a "jurisdictional thicket" in pursuing a monetary claim against the FDIC or a tort claim within the discretionary exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a), because its action would simply seek judicial review of the FDIC decision upholding Doolin's risk classification. The district court would review the action pursuant to Chapter 7 of the APA, 5 U.S.C. § 706. The court would substantially defer to the FDIC's interpretation of any statute it administers but would set aside the FDIC's legal conclusions that rest on erroneous legal foundations. *See* 5 U.S.C. § 706; *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 454, 106 S.Ct. 2009, 2015–16, 90 L.Ed.2d 445 (1986); *Chevron,* 467 U.S. at 842–44 & n. 9, 104 S.Ct. at 2781–83 & n. 9. Additionally, because the FDIC's procedures involved informal adjudication, the district court would set aside the FDIC decision if it were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402,

415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971); *Aquino v. Stone*, 957 F.2d 139, 143 (4th Cir.1992). If the court determined the rating were erroneous under this standard of review, the court would remand the case and Doolin would be entitled to a refund of any overpayment with interest. This opportunity for judicial review of FDIC reclassification determinations therefore supports our conclusion that the FDIC's risk classification review procedures satisfy due process.

In holding that the FDIC review procedures satisfy due process, we further recognize that a depository institution has adequate OTS procedural remedies through which it can directly challenge its OTS composite rating. Under the OTS three-tier administrative review process, an institution may challenge its rating at the OTS district level and then may appeal the decision to the regional level and then to the OTS Director. Once administrative review within the OTS is exhausted, an institution may seek judicial review of the OTS action under the APA.[16]

This opportunity for OTS review is important to the constitutionality of the FDIC review procedures because throughout Doolin's appeal process, the FDIC has maintained that Doolin's risk classification was "based largely" on its OTS composite rating and that Doolin should seek direct review of its composite rating in OTS procedures. In denying Doolin's initial request for reclassification, the FDIC stated that its review procedure "was not intended to address an insti-

tution's disagreement with the supervisory evaluation provided by its primary regulator." JA at 65–66 (FDIC letter dated March 25, 1993). In denying Doolin's request on appeal, the FDIC Supervision Review Committee further reasoned that Doolin has a sufficient remedy because Doolin can request reconsideration of its FDIC classification if the OTS retroactively revises Doolin's composite rating. JA at 68 (FDIC letter dated July 7, 1993). Given this opportunity for direct administrative and judicial review of an institution's OTS composite rating, we conclude that the FDIC risk classification review procedures do not violate due process by refusing to review an institution's composite rating, which forms the basis for the institution's risk classification.[17]

### 3. Disinterested decisionmaker

■ Finally, Doolin argues that the FDIC procedures violate its Fifth Amendment due process rights to a disinterested decisionmaker. Specifically, Doolin argues that the FDIC has an institutional pecuniary interest in the outcome of the assessment process because 12 U.S.C. § 1817(b)(1)(C)(iii) requires the FDIC to consider the "revenue needs of the deposit insurance fund" in calculating an institution's semiannual assessments. Doolin also contends that the FDIC has an incentive to place savings institutions in more adverse risk-based deposit insurance categories than comparable bank insurance fund members because the bank insurance

16. Doolin challenged its OTS composite rating in the first two levels of the OTS review process, but it did not appeal the regional level decision to the OTS Director. In denying Doolin's request for review at the regional level, the OTS reasoned that it had not taken any action under its "Prompt Corrective Action" authority in Section 38 of the FDIA and 12 C.F.R. § 565 (mistakenly referred to as § 567 in the OTS letter) that would entitle Doolin to a hearing. JA at 207–08 (OTS letter dated March 19, 1993).

17. We base our description of the OTS review process on the FDIC's representations at oral argument. At oral argument, the FDIC outlined the three-tier OTS administrative review process and maintained that "[t]he position of OTS and FDIC in this proceeding throughout has been that under OTS there is an opportunity for both administrative and judicial review in OTS proceedings." Oral argument for *Doolin Security*

*Sav. Bank, F.S.B. v. FDIC*, 53 F.3d 1395, Dec. 5, 1994. We assume that the FDIC correctly characterized the OTS procedures for purposes of this appeal although the FDIC pointed to no case law, statutes, regulations, or official documents that detail these procedures or the opportunity for judicial review, other than 5 U.S.C. § 702, which provides a general right of judicial review of agency action. Doolin does not dispute that the OTS has procedures to review composite ratings but argues that the OTS regulations do not delineate the existence of these procedures and that it has exhausted any such review given the OTS's refusal to provide a hearing because the OTS did not take any action under its Prompt Corrective Action authority. We hold today that the FDIC review procedures satisfy due process, but we recognize that the lawfulness of the FDIC procedures may depend on whether the OTS procedures comport with the standards of due process.

fund, which the FDIC administers, will be fully funded by the. end of 1995, while the SAIF remains underfunded as a result of the savings and loan crisis in the late 1980s. *See* Petitioner's Reply Br. at 20–21 (citing Keith Bradsher, *S. & L.'s See New Threat, This Time From Banks,* N.Y. Times, Oct. 20, 1994, at C2). As the party making the assertion of bias, Doolin bears the burden of establishing that the FDIC has a disqualifying interest. *Schweiker v. McClure,* 456 U.S. 188, 196, 102 S.Ct. 1665, 1670–71, 72 L.Ed.2d 1 (1982).

The Supreme Court has jealously protected the due process requirement of impartiality when the decisionmakers stood to gain substantial, personal pecuniary benefits from their adjudicative decisions. *See, e.g., Tumey v. Ohio,* 273 U.S. 510, 523, 532–34, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927) (reversing convictions imposed by mayor in mayor's court when mayor's fees and costs directly depended on fines imposed from convictions and when village financially benefitted from fines); *Connally v. Georgia,* 429 U.S. 245, 250–51, 97 S.Ct. 546, 548–49, 50 L.Ed.2d 444 (1977) (invalidating system in which justices of the peace were paid for issuance but not for nonissuance of search warrants); *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 820–25, 106 S.Ct. 1580, 1584–87, 89 L.Ed.2d 823 (1986) (holding state supreme court justice disqualified under due process clause when justice had pending an action for damages he had filed on the same issue in another court). The Court has further reasoned that personal pecuniary interests may disqualify an adjudicator in an administrative setting as well as a judicial setting. *Gibson v. Berryhill,* 411 U.S. 564, 578–79, 93 S.Ct. 1689, 1697–98, 36 L.Ed.2d 488 (1973) (reasoning that members of Board of Optometry were disqualified because they personally benefitted from reduced competition through license revocations).

The Supreme Court has held that institutional pecuniary interests rendered the adjudicator unconstitutionally biased only in *Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). In *Ward,* the Mayor of Monroeville was also the presiding judge of the mayor's court, which

heard cases of ordinance violations and certain traffic offenses. On grounds of separation of powers, the Court invalidated the procedure by which fines, forfeitures, costs, and fees produced from the mayor's court accounted for a substantial portion of city revenues. Although the mayor's salary was not dependent on these sums, the Court held that the mayor was unconstitutionally biased because his "executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court." *Id.* at 59–62, 93 S.Ct. at 82–84; *see also Meyer v. Niles Township,* 477 F.Supp. 357, 362 (N.D.Ill.1979) (holding that township supervisors cannot impartially adjudicate claims for benefits and supervise funds out of which benefits are paid). *But see Dugan v. Ohio,* 277 U.S. 61, 65, 48 S.Ct. 439, 440, 72 L.Ed. 784 (1928) (rejecting similar due process challenge to conviction obtained in mayor's court because mayor had very limited executive authority). The Court based its conclusion on the test in *Tumey* that the mayor's situation was one "which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused." *Ward,* 409 U.S. at 60, 93 S.Ct. at 83 (quoting *Tumey,* 273 U.S. at 532, 47 S.Ct. at 444).

Doolin's claim of institutional bias is significantly different from interest addressed in *Ward* and is more akin to the claim in *Hammond v. Baldwin,* 866 F.2d 172 (6th Cir. 1989). The claimants in *Hammond* alleged that the state administrative process was biased in issuing wastewater treatment permits because the state had contracted with a private corporation to "use its best efforts" to expedite the review of permits as part of the state's incentive program to entice the corporation to locate in the state. *Id.* at 174. In *Hammond,* the Sixth Circuit distinguished *Ward* and *Gibson* to conclude that an entire state government would not be disqualified from decisionmaking on the grounds of bias when claimants alleged general institutional bias in favor of a state interest or policy. *Id.* at 177. In its reasoning, the court also distinguished *United Church of the Medical*

*Center v. Medical Center Commission,* 689 F.2d 693, 699–700 (7th Cir.1982), in which the Seventh Circuit found the state's Medical Center Commission was biased because the Commission gained a direct pecuniary benefit from decisions against property owners. *Hammond,* 866 F.2d at 177. Specifically, the court in *United Church* reasoned that the Commission was biased in adjudicating proceedings in which the Commission determined whether property was to revert to itself, without cost to the Commission even if the property had valuable improvements, and in which the Commission obtained the proceeds from any subsequent sale of the property. *United Church,* 689 F.2d at 699–700.

Following the reasoning in *Hammond,* we hold that finding the FDIC biased in this case would seriously undermine the ability of agencies in general to adjudicate disputes that affect their official policies. Unlike the claimants in the Supreme Court cases above, Doolin does not isolate certain decisionmakers and indicate reasons why those particular adjudicators are biased. Doolin rather alleges that the entire decisionmaking apparatus of the FDIC is biased because Congress has required the FDIC to consider the needs of the insurance fund in determining assessments. This general allegation implies an institutional bias much less influential than the institutional "temptation" in *Ward,* in which the mayor's executive function substantially benefitted from fines he imposed in his adjudicative function. *See Ward,* 409 U.S. at 59–60, 93 S.Ct. at 82–83. Moreover, unlike the unrestricted pecuniary interest of the medical commission in *United Church,* the FDIC's interest in providing for the fund is circumscribed under 12 U.S.C. § 1817(b)(2)(A)(iv).[18] This statutory limitation is important to adjudging institutional bias as this Court has reasoned that statutory restrictions placed on administrative adjudicators support a finding that a dispute resolution mechanism is not institutionally biased. *See Republic Indus., Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund,* 718 F.2d 628, 640–41 (4th Cir.

1983) (reasoning that trustees were not biased in making determinations of withdrawal liability, in part, because their computation of liability was prescribed by the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1381 *et seq.*), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984).

The FDIC's interest in maintaining the fund appears no greater than the interests of many agencies that adjudicate penalty or fee determinations in their own administrative proceedings. Presumably all agencies inherently have some level of "institutional bias," but such an interest does not render all agencies incapable of adjudicating disputes within their own proceedings given the strong public interest in effective, efficient, and expert decisionmaking in the administrative setting. Thus, we decline to abrogate the presumption of honesty and integrity of administrators who serve as adjudicators, *see Schweiker,* 456 U.S. at 195, 102 S.Ct. at 1669–70; *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464–65, 43 L.Ed.2d 712 (1975); and we agree with the Board's decision that the FDIC procedures do not violate Doolin's due process right to a disinterested decisionmaker.

### C.

Doolin next challenges the FDIC's authority to commence an administrative proceeding to terminate the insurance of an institution that has withheld portions of its insurance assessments. Doolin first argues that the FDIC lacked subject matter jurisdiction to resolve the dispute and collect the withheld assessments. Specifically, Doolin claims that an action to collect money from an insured financial institution is akin to an action to collect a debt that should be resolved by an Article III court pursuant to section 7(g) of FDIA, 12 U.S.C. § 1817(g), and that the savings institution would have the right to a jury trial in the court proceeding. The Board concluded that the termination of insurance proceeding was an appropriate recourse because it would not be "fiscally pru-

---

**18.** Under 12 U.S.C. § 1817(b)(2)(A)(iv), Congress designated the reserve ratio of each deposit insurance fund to be 1.25% of total estimated insured deposits or a "higher percentage" if the FDIC Board determines that circumstances "raise[ ] a significant risk of substantial future losses to the fund."

dent" for the FDIC to commence protracted litigation each time an institution refused to pay an assessment.[19] JA at 312 (Board decision at 7–8).

An administrative agency is entitled to considerable deference in selecting the remedies to enforce the policy of a statute it administers. *See Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1457–58, 36 L.Ed.2d 142 (1973); *American Power & Light Co. v. SEC*, 329 U.S. 90, 112, 67 S.Ct. 133, 145–46, 91 L.Ed. 103 (1946). We thus may not overturn an agency's choice of remedy unless we find it "unwarranted in law or ... without justification in fact." *American Power*, 329 U.S. at 112–13, 67 S.Ct. at 145–46. Importantly, while 12 U.S.C. § 1817(g) provides the FDIC with the authority to commence an action in "any court of competent jurisdiction" against a financial institution that fails to pay all or part of its insurance premium assessments, this remedy is not exclusive. Under 12 U.S.C. § 1818(a)(2)(A), the FDIC is also authorized to commence an administrative hearing to terminate the insurance of an insured institution that has "violated any applicable law, regulation, order, [or] condition imposed in writing" by the FDIC.[20] Nothing in § 1817(g) limits this authority under § 1818(a). Furthermore, as the Board noted, "the language of section 1817(h) [of Title 12] is clear on its face that the remedies of section 1817(g) are *in addition to* any other remedy against an insured depository institution available to the FDIC (emphasis added)." JA at 313 (Board decision at 9). Section 1817(h) provides:

The remedies provided in this subsection and in subsections (f) and (g) of this sec-

tion shall not be construed as limiting any other remedies against any insured depository institution, but shall be in addition thereto.

12 U.S.C. § 1817(h).

The Board has previously stated that "[t]he purpose of a termination [of insurance] proceeding is to limit the risk an insured institution poses to the insurance fund." *In re First State Bank of Marlin*, FDIC Enforcement Decisions and Orders ¶ 8013, at I–50 (1992). Doolin's self-help decision to withhold portions of its assessments poses such a danger to the insurance fund. The fund would be at risk if the FDIC were obliged to commence a district court action each time an institution followed Doolin's actions and unilaterally withheld the portions of its assessments it considered erroneous. As noted, the fund depends on the institutions' assessments and the interest those assessments earn to enable the FDIC to tackle any crisis that might arise due to financial institution failure. Withholding disputed assessments is not the only alternative for institutions such as Doolin. As concluded above, depository institutions have adequate opportunity to challenge their classifications through FDIC administrative procedures and judicial review of FDIC decisions. Thus, given the inclusive language in the statute and the policy reasons supporting the FDIC's decision that it would not be "fiscally prudent" to commence a district court action, we conclude that the FDIC has the authority to instigate a termination of insurance proceeding when an institution violates applicable law and withholds portions of its insurance assessments.[21]

---

**19.** Given the Board's justification, we reject Doolin's argument that the Board's decision was arbitrary and capricious because it failed to provide any rationale for the FDIC's decision to terminate Doolin's insurance rather than exercise its collection remedy under § 1817(g). Furthermore, the FDIC's choice of a remedy remains discretionary, and it is not controlling that the FDIC did initiate a district court action to collect unpaid assessments in a case twelve years ago, *FDIC v. European American Bank & Trust Co.*, 576 F.Supp. 950 (S.D.N.Y.1983).

**20.** Doolin argues that its withholding of money was not a "violation" under the FDIA for which

the termination of insurance is justified under § 1818(a). Because this Court accords substantial deference to an agency's interpretation of a statute it administers, *see Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys.*, 468 U.S. 207, 217, 104 S.Ct. 3003, 3009, 82 L.Ed.2d 158 (1984), we decline to find erroneous the Board's conclusion that Doolin's withholding the amount in dispute constituted a "violation" under § 1818(a).

**21.** We reject Doolin's argument that the FDIC's termination of insurance action is akin to an action to collect a debt. As the Board reasoned, the FDIC's motivation for commencing this ac-

 Doolin argues, in the alternative, that even if the FDIC had the power to terminate Doolin's deposit insurance, the Board's decision was arbitrary and capricious and failed to satisfy 5 U.S.C. § 557(c)(3) because it did not address all of Doolin's factual and legal arguments.[22] Regarding Doolin's factual exceptions, the critical factual issues in this case involving Doolin's nonpayment of portions of its insurance assessment were undisputed. Consequently, neither the ALJ nor the Board need have discussed Doolin's exceptions, which primarily concerned the 1992 OTS examination and Doolin's risk classification assignment. See JA at 309 (Board Decision at 5 n. 5) (noting that Doolin's factual exceptions were not relevant). Regarding Doolin's legal exceptions, the Board's 15-page decision provided a reasoned discussion of the legal arguments the Board considered material. The Board's failure to address every argument in detail does not render its decision arbitrary. We therefore hold that the FDIC decision was not arbitrary and capricious and did not violate 5 U.S.C. § 557(c)(3).[23]

### IV.

For the foregoing reasons, we affirm the decision of the FDIC Board of Directors to terminate Doolin's federal deposit insurance.

*AFFIRMED.*

tion, to encourage Doolin to pay its full assessment, does not alter the nature of this action. This action is to terminate Doolin's insured status, and the FDIC seeks no money in this action. Furthermore, because we conclude that the FDIC need not have initiated a district court action, we need not address whether Doolin has a right to a jury trial in such an action.

**22.** Under 5 U.S.C. § 557(c)(3), all agency decisions required to be on the record "shall include

a statement of—(A) findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record."

**23.** We also note that the Board's decision is supported by substantial evidence, the appropriate standard of review for formal adjudication. See 5 U.S.C. § 706(2)(E); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971).