Henry H. SHAVITZ, for himself and others similarly situated, Plaintiff,

v.

CITY OF HIGH POINT, a municipal corporation, Electronic Data Systems Corporation, a Corporation doing business in North Carolina, Allen L. Pearson, II, Peek Traffic, Inc., a Corporation doing business in North Carolina, Phil Wylie, Sreekanth Nandagiri, Arnold Koonce, Mayor of the City of High Point, Albert A. Campbell, M. Christopher Whitley, Aaron Lightner, Ronald B. Wilkins, M.C. Rowe, William S. Bencini, Jr., David B. Wall, each members of the High Point City Council, Strib Boynton, City Manager of the City of High Point,

and

The Guilford County Board of Education, Defendants.

No. 1:01CV00662.

United States District Court, M.D. North Carolina.

July 9, 2003.

Marshall Hurley, Marshall Hurley, PLLC, Robert Lauris Johnston, Deceased, Hunter Johnston Elam & Benjamin, PLLC, for Plaintiff.

Gusti W. Frankel, Alison Raney Bost, Womble Carlyle Sandridge & Rice POD 84, James R. Fox, Kevin Guy Williams, Bell Davis & Pitt, P.A., Winston–Salem, NC, Teresa Deloatch Bryant, Elizabeth V. Lafollette, Robert James King, III, Brooks Pierce McLendon Humphrey & Leonard, Greensboro, NC, for Defendants.

Isaac T. Avery, III, Harold F. Askins, N.C. Department of Justice, Raleigh, NC, for Movant.

## MEMORANDUM OPINION

BEATY, District Judge.

## I. INTRODUCTION

This case involves several Motions for Summary Judgment. After first filing an Answer and Request for Declaratory Judgment [Document # 13] on August 3, 2001, Defendant Guilford County Board of Education ("The Board") filed a Motion for Partial Summary Judgment [Document # 21] on March 1, 2002. Defendants City of High Point, Phil Wylie, Sreekanth Nandagiri, Arnold Koonce, Albert A. Campbell, M. Christopher Whitley, Aaron Lightner, Ronald B. Wilkins, M.C. Rowe, William S. Bencini, Jr., David B. Wall, Strib Boynton (the "City Defendants"), and Peek Traffic, Inc. ("Peek") filed a Motion for Summary Judgment [Document # 23] on March 4, 2002. On March 5, 2002, Defendants Electronic Data Systems Corporation ("EDS") and Allen L. Pearson, II ("Pearson") filed a Motion for Summary Judgment [Document # 27].[1] The State of North Carolina, having been granted leave to enter the case as an intervenor by an Order filed October 9, 2001 [Document # 16], filed a Motion to Dismiss And/Or for Summary Judgment and Remand [Document # 31] on March 11, 2002. Finally, on March 13, 2002, Plaintiff Henry H. Shavitz ("Plaintiff") filed a Motion for Summary Judgment [Document # 34].

For the following reasons, the Motion for Summary Judgment filed by the City Defendants and Peek [Document # 23] will be GRANTED IN PART to the extent that all claims against these Defendants will be dismissed, with the exception of Claims Three, Five, and Six which will be remanded to the state court for determination. The Motion for Summary Judgment filed by Defendants EDS and Pearson [Document # 27] will be GRANTED IN PART to the extent that all claims against these Defendants will be dismissed, with the exception of Claims Three, Five, and

---

1. Although Defendants EDS and Pearson have raised various arguments in support of their Motion for Summary Judgment, the Court will not address all of them. In their Brief in Support of their Motion, EDS and Pearson state that they "affirmatively incorporate, as if completely set forth herein, the arguments of the City that [the laws in question] comply with the constitutional protections afforded by the Constitutions of the State of North Carolina and the United States. As a result, the Court should dismiss Plaintiff's due process and equal protection claims in their entirety." (EDS and Pearson's Br. In Supp. of Mot. for Summ. J., at 9.) The Court's ruling will indeed dismiss Plaintiff's due process and equal protection claims in their entirety; this dismissal applies with the same weight to EDS and Pearson as it does to all other Defendants and therefore alleviates the need to analyze EDS and Pearson's further arguments.

Six which will be remanded to the state court for determination. The Motion to Dismiss And/Or for Summary Judgment and Remand filed by the State of North Carolina [Document # 31] will be GRANTED as follows: the portion of the State's Motion requesting summary judgment against Claims One and Two will be GRANTED; the portion of the State's Motion requesting a remand of Claims Three, Five, and Six will also be GRANTED; the portion of the State's Motion requesting dismissal for failure to state a ground on which the statute may be invalid will be DENIED as moot, in light of the grant of the Motion's request for summary judgment. For all the same reasons, Plaintiff's Motion for Summary Judgment [Document # 34] will be DENIED in full. Finally, Defendant Guilford County Board of Education's Motion for Partial Summary Judgment [Document # 21] and their specific Request for Declaratory Judgment [Document # 13] will both be DENIED.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff was assessed a $50.00 "civil penalty" for a red light violation which was detected by cameras installed at an intersection in the City of High Point, North Carolina, under authority of North Carolina General Statute § 160A–300.1, (Complaint, Ex. A), and Section 10–1–306 of the High Point City Code of Ordinances. (Compl., Ex. B.) This action challenges the validity of those two laws.

In 1997, the General Assembly of North Carolina passed N.C. Gen.Stat. § 160A–300.1, a local act that originally applied only to Charlotte, N.C. and allowed red light cameras for the first time in North Carolina. (State of N.C.'s Mem. In Supp. of Mot. to Dismiss and/or Summ. J. and

Remand, at 3.) Between then and the year 2000 the Statute was amended various times to apply to additional municipalities including Defendant City of High Point (the "City" or "High Point"). An attempt to authorize red light cameras statewide was defeated in 1999. (*Id.*)

Recently, in the 2001 Session of the General Assembly, the original statute was again amended to encompass additional municipalities. (*Id.*) Further, in the same act, the General Assembly enacted two new statutes: N.C.G.S. § 160A–300.2 and N.C.G.S. § 160A–300.3, which allow red light cameras in Wake County and the City of Concord, respectively. These statutes are similar to the earlier-enacted § 160A–300.1 but they both contain various additional provisions not found in § 160A–300.1. The most relevant of these provisions, in light of the issues currently before the Court, states that "[t]he clear proceeds from the citations issued pursuant to the ordinance authorized by this section shall be paid to the county school fund." N.C. Gen.Stat. §§ 160A–300.2(g), 160A–300.3(f).

In general, section 160A–300.1 and its counterparts authorize municipalities to "adopt ordinances for the civil enforcement of G.S. 20–158[2] by means of a traffic control photographic system ...." N.C. Gen. Stat. § 160A–300.1. Pursuant to this authorization, High Point adopted Ordinance section 10–1–306 to implement such a system. (Defs EDS and Pearson's Br. In Supp. of Mot. for Summ. J., at 3.) The system functions by automatically taking a series of photographs of automobiles entering an intersection after the traffic signal has turned red. (*Id.*) These photographs are then electronically gathered into "candidate citations," which are re-

---

**2.** North Carolina General Statute § 20–158 governs traffic control violations at intersec-

tions with signs or signals.

viewed by sworn City police officers to determine which candidate citations become actual citations to be mailed to red light violators. (*Id.*)

To carry out its traffic control photographic system, the City contracted with Defendant Peek Traffic, Inc. ("Peek") to install traffic control photographic systems at several intersections in High Point. (Compl.¶ 35.) Additionally, Peek agreed to perform certain functions including collecting the photographs, converting them into candidate citations, and performing other tasks at the direction of the City. (Compl., Ex. C.) Peek, in turn subcontracted some of its duties and responsibilities to Defendant Electronic Data Systems, Corp. (Defs EDS and Pearson's Br. In Supp. of Mot. for Summ. J., at 3.) Allen L. Pearson, II, a Client Delivery Executive with EDS, is responsible for overseeing EDS' office in High Point. (*Id.*)

EDS is responsible for the process by which "candidate citations" are generated, which includes a review of each digital photograph taken. (The City Defs' Br. In Supp. of their Mot. for Summ. J., at 3.) If the license plate is deemed illegible, then that photograph is not reviewed any further and no citation is issued. (*Id.*) In addition, EDS reviews the photographs to determine if there is an "obvious legitimate explanation" for the red light violation, such as a funeral procession or a right turn on red. (*Id.* at 3–4.) For all photographs in which the license plate is legible and for which there is no obvious legitimate explanation for the red light violation, EDS determines the registered owner of the vehicle pictured and then prints the "proposed," or, "candidate" citations, to be reviewed by a City of High Point police officer. (*Id.* at 4.)

Once a police officer reviews the proposed citation and determines an official citation should be issued, EDS mails the citation to the registered owner of the vehicle. (*Id.*) Information on the citation includes the time and date, the vehicle's speed, and the red time, which is the length of time the traffic signal had been red at the time of each photograph. (*Id.*; Compl., Ex. F.) The governing statute and ordinance state that violations detected by High Point's traffic control photographic system are "noncriminal" and, accordingly, no driver's license points or insurance points are assessed to violators. N.C. Gen.Stat. § 160A–300.1(c)(2); City Ord. § 10–1–306(c).

As the reverse side of the citation explains, if a citation recipient chooses not to pay the $50.00 "civil penalty," he or she may file an appeal. (Compl., Ex. F.) If no payment is received and the citation recipient does not respond within the time allotted, a notice of failure to comply may be issued and the citation recipient can be assessed an additional $50.00 late penalty. N.C. Gen.Stat. § 160A–300.1(c)(3); City Ord. § 10–1–306(c). If an appeal is filed, an appellant must state the reasons for appealing in a small space provided on the back of the citation and submit the form, along with a $50.00 appeal bond, to the SafeLight Piedmont office. (Compl., Ex. F.) Appellants are notified of the time and place to appear at a nonjudicial administrative hearing. (The City Defs' Br. In Supp. of Their Mot. for Summ. J., at 4.) Appeals are heard by one of two High Point University professors who have agreed to serve as appeal hearing officers. (*Id.*)

The money collected by the City from the fines and penalties resulting from citations issued in connection with the traffic control photographic system is placed in the Red Light Camera Campaign Penalties Fund. (The City Defs' Br. In Supp. of Their Mot. for Summ. J., at 5.) This fund is separate from the City's general operating fund and is used, first, to pay Peek for its

work in connection with the installation and operation of the system and to compensate the appeal hearing officers at a rate of $25.00 per appeal. (*Id.*) Any money remaining after payment of those expenses is "dedicated for safety-related transportation improvements and traffic safety programs, such as a safe driving public education campaign." (*Id.*)

In the case at bar, Plaintiff's automobile was photographed running a red light at the intersection of Main and College in High Point on April 21, 2001. (Compl., Ex. F.) On May 3, 2001, Plaintiff was issued a citation for this violation and was instructed to pay a $50.00 "civil penalty" by May 24, 2001. Plaintiff received this citation at his home address, refused to pay, but did not appeal. (The City Defs' Br. In Supp. of Their Mot. for Summ. J., at 2.) Because Plaintiff did not respond to the citation, he was issued a notice of failure to comply which carried with it an additional $50.00 penalty. (Compl., Ex. G.) Plaintiff again refused to pay but did not appeal from the notice of failure to comply. (The City Defs' Br. In Supp. of Their Mot. for Summ. J., at 2.) To date, Plaintiff has made no payments to the City in connection with either the citation or notice of failure to comply. (*Id.*) Pursuant to N.C. Gen.Stat. § 160A–300.1(c)(3) and City Ord. § 10–1–306(c), the City is statutorily authorized to seek to collect the monies Plaintiff owes through a civil action in the nature of debt, but the City has not pursued any such action against Plaintiff. (The City Defs' Br. In Supp. of Their Mot. for Summ. J., at 2–3.)

This action commenced on June 13, 2001 with Plaintiff's filing of a Complaint in the General Court of Justice, Superior Court Division, Guilford County, North Carolina seeking damages, declaratory judgment, injunctive relief, and class action status. (Compl., at 2.) Plaintiff's claims for relief were based on the following assertions: 1) violation of Plaintiff's state and federal Due Process rights; 2) violation of Plaintiff's state and federal Equal Protection rights; 3) violation of Plaintiff's rights provided by Article IV § 12(6) of the Constitution of North Carolina; 4) disclosure of confidential information by the Municipal Defendants to the Corporate Defendants in violation of 18 U.S.C. §§ 2721, et seq.;[3] 5) unlawful taxation by the City of High Point; and 6) violation of Article I § 6 of the North Carolina Constitution. (Compl.¶¶ 90–113.) As an alternative claim for relief, Plaintiff asserts that Defendant City of High Point is engaged in an unlawful and unconstitutional diversion of fines and penalties.

On July 9, 2001, all Defendants joined in the removal of the action to this Court. On July 25, 2001, the State of North Carolina field a Motion to Intervene, pursuant to 28 U.S.C. § 2403(b), which the Court granted on October 9, 2001. The case is currently before the Court on all parties' motions for summary judgment.

### III. DISCUSSION

#### A. Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is considered "material" if it "might affect the outcome of the suit under the governing law ...."

---

**3.** On July 6, 2001, before the case was removed to this Court, Plaintiff voluntarily dismissed the Fourth Claim for Relief. (*See* City Defs' Br. in Supp. of Mot. for Summ. J., at 2; State of North Carolina's Mem. In Supp. of Mot. to Dismiss and/or Summ. J. and Re-

mand, at 16.) Therefore, the Court will not address Plaintiff's Fourth Claim, which alleges disclosure of confidential information by the Municipal Defendants to the Corporate Defendants in violation of 18 U.S.C. §§ 2721, et seq.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* As a result, the Court will only enter summary judgment in favor of the moving party when " 'the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the [nonmoving] party cannot prevail under any circumstances.' " *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir.1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir.1967)).

When ruling on a summary judgment motion, the Court views the evidence in the light most favorable to the non-moving party, according that party the "benefit of all reasonable inferences." *Bailey v. Blue Cross & Blue Shield of Virginia*, 67 F.3d 53, 56 (4th Cir.1995), *cert. denied*, 516 U.S. 1159, 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996). The moving party bears the initial burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *Catawba Indian Tribe of South Carolina v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir.1992), *cert. denied*, 507 U.S. 972, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993). Once the moving party has met this burden, the adverse, or non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.*

In so doing, the adverse party may not rest on mere allegations, denials, or unsupported assertions, but must, through affidavits or otherwise, provide evidence of a genuine dispute. *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12, 91 L.Ed.2d 202; *Catawba Indian Tribe*, 978 F.2d at 1339. In other words, the non-moving party must show "more than ... some metaphysical doubt as to the material facts," for the mere existence of a scintilla of evidence in support of his position is insufficient to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Catawba Indian Tribe*, 978 F.2d at 1339.

The Court will address each of Plaintiff's claims for relief in the order in which they were presented in the Complaint.

### B. State and Federal Due Process Claim

Plaintiff's first claim for relief is that "[t]he acts, means, methods, scheme, policy and custom established by N.C. Gen.Stat. § 160A–300.1, Sec. 10–1–306 of the High Point City Code of Ordinances and the contract between Defendant City of High Point and Peek and the concerted actions of Defendants,[4] under color of law, operate together to violate Plaintiff's substantial rights, privileges and immunities guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the 'law of the land' provision of the Constitution of North Carolina, Art. I, sec. 19 ...." [5] (Compl.,

---

**4.** Plaintiff does not specify how "the contract between Defendant City of High Point and Peek" or how "the concerted actions of Defendants," as distinct from the operation of the statute and ordinance themselves, could independently bring about a violation of his Due Process rights. Accordingly, the Court will only examine the implications of Plaintiff's due process claim as it directly applies to the statute and ordinance and to Defendants' actions pursuant to those laws.

**5.** The North Carolina Supreme Court "has held that the term 'law of the land,' as used in Article I, Section 19 of the North Carolina Constitution, is synonymous with 'due process of law' as that term is applied under the Fourteenth Amendment to the United States Constitution." *Petition of Smith*, 82 N.C.App. 107, 109, 345 S.E.2d 423, 425 (1986) (citing *In re Moore*, 289 N.C. 95, 221 S.E.2d 307 (1976)).

¶ 91.) Essentially, Plaintiff's argument is that "[t]he procedures used by Defendants violate ... principles of due process ...," and thus Plaintiff asserts a procedural, rather than a substantive, due process claim.[6] (Pl.'s Mem. In Supp. of Mot. for Summ. J., at 4.) Consequently, the Complaint asserts, "Plaintiff and others similarly situated are entitled to redress pursuant to 42 U.S.C. § 1983 and the 'law of the land' provision of the Constitution of North Carolina, Art. I, sec. 19."[7] (*Id.* ¶ 93.)

In order to state a claim for denial of procedural due process, a complainant must first establish that she has been deprived of a property or liberty interest. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Here, Plaintiff's property interest presumably lies in the $50.00 "civil penalty" that was assessed against him in connection with the citation he received for his stoplight violation. In light of this deprivation, the next question becomes what process was due Plaintiff. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 1154, 71 L.Ed.2d 265 (1982) ("[W]e are faced with what has become a familiar two-part inquiry: we must determine whether [Plaintiff] was de-

prived of a protected interest, and, if so, what process was his due."). "[A]t a minimum," the Fourteenth Amendment's Due Process Clause "require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Id.* (quotation omitted).

Before Plaintiff can pursue a challenge to the procedures provided by Defendants however, he must satisfy the requirements of Article III of the Constitution which "limits the jurisdiction of federal courts to actual 'cases' or 'controversies.'" *Star Scientific Inc. v. Beales,* 278 F.3d 339, 358 (4th Cir.2002) (quoting U.S. Const. art. III, § 2). Thus, it is a jurisdictional requirement that a person challenging a government action be a party to a live case or controversy. This "standing requirement 'is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Id.* (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)). "To establish standing, a party must establish, as 'the irreducible constitutional minimum,' three elements: (1) that it has suffered an injury in fact that is both concrete and particularized and 'actual or imminent, not conjectural or hypothetical'; (2) that there

---

6. Even if Plaintiff's claim were interpreted as pursuing the substantive due process approach, it could not succeed since the legislation in question falls into the category of social policy or economic legislation and therefore a court examining the validity of such legislation in the face of a substantive due process challenge need only decide whether it is rationally related to a legitimate government interest. *Star Scientific Inc. v. Beales,* 278 F.3d 339, 348 (4th Cir.2002) ("To comport with the limited scope of substantive due process protection, economic legislation need only be rationally related to a legitimate government interest.") As will be discussed below in the context of Plaintiff's equal protection claim, the Court finds that the state statute and city ordinance both satisfy this lenient test.

7. Because "North Carolina courts have consistently interpreted the due process and equal protection clauses of the North Carolina Constitution as synonymous with their Fourteenth Amendment counterparts," this Court will analyze the entirety of Plaintiff's due process and equal protection claims for relief according to applicable principles of federal law. *Tri–County Paving, Inc. v. Ashe County,* 281 F.3d 430, 435 n. 6 (4th Cir.2002) (citations omitted). As the language from *Tri–County Paving* suggests, this Court's analysis will apply to Plaintiff's claims with equal force regardless of whether the claims are viewed as being founded on federal principles or on those of North Carolina law.

is a causal connection between the injury and the conduct complained of, i.e. the injury is 'fairly traceable' to the challenged action; and (3) that it is 'likely ... that the injury will be redressed by a favorable decision.'" *Id.* (quoting *Lujan* at 560–61, 112 S.Ct. at 2136).

■ The State of North Carolina contends that "[b]ecause Plaintiff has failed to use the process provided to him, he cannot show that he has suffered injury because of the insufficiency of the process provided." (State of N.C.'s Mem. In Supp. of Mot. to Dismiss and/or Summ. J. and Remand, at 8.) The State's reasoning is persuasive. The Fourth Circuit has echoed the words of the Supreme Court in mandating that "'[t]he [federal procedural due process] violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process.'" *Fields v. Durham*, 909 F.2d 94, 98 (4th Cir.1990) (quoting *Zinermon v. Burch*, 494 U.S. 113, 126, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990)) (alterations by *Fields* court). Thus, while it is generally true that "[d]ue process of law ... requires that a deprivation of property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case,'" *Tri-*

*County Paving, Inc. v. Ashe County*, 281 F.3d 430, 436 (4th Cir.2002) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950)), the Fourth Circuit has further held that "to determine whether a procedural due process violation has occurred, courts must consult the entire panoply of predeprivation and postdeprivation process provided by the state." *Id.* (quotation omitted).

Plaintiff does not have standing to challenge the conduct of Defendants because he has failed to show "that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant ... and that the injury is likely to be redressed by a favorable decision ...." *Heckler v. Mathews*, 465 U.S. 728, 738, 104 S.Ct. 1387, 1394, 79 L.Ed.2d 646 (1984) (internal quotation and citations omitted). Much like the plaintiff in a similar district court case, Mr. Shavitz "cannot trace any deprivation or threatened deprivation of property to any of the adjudicative procedures (as outlined in both the ordinance and the enabling statute) that he questions because he never made use of them." *Walter v. City of Chicago*, 1992 WL 88457, at *3 (N.D.Ill. April 27, 1992).[8] At this stage, these pro-

8. Defendants also raise a related argument asserting that "[a] plaintiff who does not avail himself of hearing rights provided cannot be heard to complain that he has been denied his due process hearing rights." (City Defs.' Reply Br. To Pl.'s Resp. in Opp'n to Mot. for Summ. J., at 2.) This argument is well founded. *See Fuller v. Laurens County Sch. Dist. No. 56*, 563 F.2d 137, 140 (4th Cir.1977) ("Assuming that plaintiffs were constitutionally entitled to pretermination hearings, a review of the record is persuasive that plaintiffs voluntarily and after deliberation waived this right by declining the proffered invitation to appear before the board .... [W]hen this opportunity [for a hearing] is granted a complainant, who chooses not to exercise it, that complainant cannot later plead a denial of procedural due process." (quotation omit-

ted)); *Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir.1982) ("a state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them.").

However, the caselaw supporting such an argument predates the Supreme Court's modern standing jurisprudence, as set forth in the capstone case of *Lujan*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351. The Court will therefore analyze the issue according to the more modern doctrine of standing, rather than the older, but seemingly no less applicable, notion of waiver. Regardless, the basic reasoning is the same: Plaintiff has not taken advantage of the procedural processes offered to him, therefore he has not been harmed one way or another by such processes and, ac-

ceedings are no longer available to Plaintiff because the time allotted for availing himself of them has expired. In addition, there has been no showing that the threat of a future deprivation as a consequence of these challenged procedures is so imminent as to confer standing. Therefore, because an alleged violation under § 1983 is not complete "unless and until the State fails to provide Due Process," *Fields*, 909 F.2d at 98, and Plaintiff has not availed himself of the process Defendants have provided, Plaintiff has not suffered a concrete and particularized injury as a result of such allegedly deficient process and therefore has no standing to challenge it.[9]

■ Nevertheless, the Court has also considered the merits of Plaintiff's due process claim and finds that, even if Plaintiff had standing to assert such a claim, no genuine issues of material fact have been presented and the claim must still fail as a matter of law. As previously mentioned, Plaintiff alleges that the "acts, means, methods, scheme, policy, and custom" established by the challenged statute and ordinance "under color of law, operate together to violate Plaintiff's substantial rights, privileges and immunities guaranteed by the Due Process Clause ...." (Compl.¶ 91.) Specifically, Plaintiff

charges that Defendants' actions violated his rights in the following respects:

a. The mailing of a citation to a registered vehicle owner unlawfully presumes the guilt and financial responsibility of the owner, and unlawfully places upon him or her the responsibility of establishing innocence.

b. The hearing process unlawfully denies an appellant an opportunity to confront and cross-examine witnesses against him.

c. The printed appeal form ... severely, unreasonably, arbitrarily and capriciously limits and restricts, to an impermissible and unconstitutional degree, the right to present issues on appeal.

d. The closed appeal hearing violates the rights of Plaintiff and others similarly situated to a fair hearing process, in violation of the substantial right to due process ....

e. The method of selection, training and compensation of [the] hearing officers ... have destroyed their ability to perform impartially, all in violation of Plaintiff's substantial right to due process ....

cordingly, cannot challenge them on due process grounds.

9. It is worth mentioning that the Court's conclusion that Plaintiff lacks standing is not at odds with *Patsy v. Florida Bd. of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), which held that there is no administrative or judicial exhaustion requirement under § 1983. As another district court faced with a similar issue explained, "[i]t is not that persons who paid their tickets had to exhaust any administrative remedies before mounting a constitutional attack on the Ordinance. Instead the point is that the persons who paid their tickets do not have a constitutional claim at all because they cannot claim the inadequacy of the process that they made no effort to bring into play." *Van Harken v. City*

*of Chicago*, 906 F.Supp. 1182, 1187 n. 5 (N.D.Ill.1995). In *Van Harken* there were various named Plaintiffs; those who "utilized administrative review," albeit "to different degrees," had standing. *Id.* at 1188 n. 7. By comparison, those who paid their tickets, and therefore "made no effort to bring [the available process] into play," lacked standing. *Id.* at 1187 n. 5. In the matter at hand, Plaintiff's situation is akin to the group of *Van Harken* plaintiffs who paid their tickets even though Plaintiff has, in fact, not "paid his ticket." The similarity lies in the fact that Plaintiff, by ignoring all process available to him and instead proceeding directly to bringing this action, "made no effort to bring into play" the available process and therefore cannot claim such process was inadequate.

f. The presentation, handling, managing and commenting on appeals in an adversary hearing before an administrative tribunal by Defendants EDS and Pearson, who have a direct financial interest in each appeal heard, constitutes the unauthorized practice of law, which *ipso facto*, violates Plaintiff's substantial right to due process . . . .

g. The photographic technology used by Peek fails more often than not according to Defendants' own records, and is demonstrably and inherently unreliable. Basing a presumption of guilt upon technology that fails 59% of the time violates Plaintiff's substantial right to due process . . . .

h. Requiring Plaintiff to pay an appeal bond prior to any formal adjudication of guilt or financial responsibility violates Plaintiff's substantial right to due process . . . .

i. The failure of the Statute and the Ordinance to provide for a system of indigent appeals violates the rights of indigent persons, for whom Plaintiff brings this claim; such failure violates substantial right to due process . . . .

j. The presumption of guilt and accompanying requirement to pay a penalty of $50.00 is an unlawful taking of property without due process of law which violates Plaintiff's substantial right to due process . . . .

(Compl. ¶¶ 91a–91j.)

As the parties recognize, it is readily apparent from these specific allegations that the core of Plaintiff's case is the issue of whether or not the statute and ordinance are criminal or civil in nature. Plaintiff states that "[a]s a threshold matter, this Court should not be misled to the conclusion that the Defendants' civil enforcement mechanism is anything less than a system for imposing a penalty for the violation of a *criminal* law." (Pl.'s Mem. In Supp. of Mot. for Summ. J., at 4 (emphasis in original).) Recognizing the same issue but advocating for the opposite conclusion, the City Defendants state that "Plaintiff's due process argument is doomed from the start because it depends in its entirety on an incorrect premise: contrary to plaintiff's stated position, the statute and ordinance are civil, not criminal, and impose only civil, and not criminal, penalties." (Defs.' Reply Br. To Pl.'s Resp. in Opp'n to Mot. for Summ. J., at 3.) Likewise, Defendants EDS and Pearson have identified the issue by stating that "the crux of plaintiff's argument is that the ordinance at issue, notwithstanding its civil label and attributes, is a criminal penalty, requiring the full measure of criminal procedural protections afforded by the United States and North Carolina Constitutions." (Resp. of Defs. EDS and Pearson to Pl.'s Mot. for Summ. J., at 2.) Naturally then, because the Due Process Clause requires "notice and opportunity for hearing *appropriate to the nature of the case,*" *Mullane,* 339 U.S. at 313, 70 S.Ct. at 656–57 (emphasis supplied), the Court must first determine the nature of Defendants' enforcement scheme to then be able to determine what measure of process is appropriate to cases arising under that scheme.

The Supreme Court addressed the system of inquiry to be used in determining whether a penalty is criminal or civil in nature in *Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997); *see also Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (same). Under *Hudson,* and the precedent it embraces, courts are to engage in a two-prong, multi-factor test. First, the court must ask whether the legislature, "in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the

other." *Hudson,* 522 U.S. at 99, 118 S.Ct. at 493 (quotation omitted). If the legislature intended a criminal penalty, then the inquiry ends at that point. *Hirsch v. City of Bowie,* 166 F.3d 1209, 1998 WL 904885, at *1 (4th Cir. Dec. 29, 1998). If the legislature intended a civil penalty, however, courts must then ask whether the "statutory scheme [is] so punitive in either purpose or effect ... as to transform what was clearly intended as a civil remedy into a criminal penalty ...." *Hudson,* 522 U.S. at 99, 118 S.Ct. at 493. In making this determination, *Hudson* instructed courts to consider the factors listed in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), including:

> (1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of *scienter*"; (4) "whether its operation will promote the traditional aims of punishment-retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned."

*Id.* at 99–100, 118 S.Ct. at 493 (quoting *Mendoza–Martinez,* 372 U.S. at 168–69, 83 S.Ct. at 567–68). Finally, *Hudson* cautioned "[i]t is important to note, however, that these factors must be considered in relation to the statute on its face ... and only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty ...." *Id.* at 100, 118 S.Ct. at 493 (internal quotations omitted); *see also Hendricks,* 521 U.S. at 361, 117 S.Ct. at 2082 (stating that "we will reject the legislature's manifest intent only where a party challenging the statute provides the clearest proof that the statutory scheme is so punitive either in purpose or effect as to negate [the legislature's] intention to deem it civil ...," and referring to this requirement as a "heavy burden" (quotations omitted)).

Applying these principles to the present case,[10] the Court must conclude that both the statute and ordinance in question are civil in nature. First, in establishing the penalizing mechanisms, the legislative bodies plainly indicated an express preference for a civil label. North Carolina General Statute § 160A–300.1 states that "[m]unicipalities may adopt ordinances for the *civil* enforcement of G.S. 20–158 by means of a traffic control photographic system ...," and that "a violation of G.S. 20–158 at a location at which a traffic control photographic system is in operation *shall not be an infraction.*" N.C. Gen.Stat. § 160A–300.1(c) (emphasis supplied). The statute further states that "[a] violation detected by a traffic control photographic system shall be deemed a *noncriminal* violation for which a *civil penalty* of fifty dollars ($50.00) shall be assessed, and for which no

---

**10.** In *Hudson* the Double Jeopardy Clause was the particular Constitutional protection at issue. The fact that "[t]he Clause protects only against the imposition of multiple *criminal* punishments for the same offense ...," gave rise to a need for the Court to discuss the scheme for determining "[w]hether a particular punishment is criminal or civil ..." in order for the Court to then be able to determine whether Double Jeopardy was applicable. *Hudson,* 522 U.S. at 99, 118 S.Ct. at 493 (emphasis supplied). However, the *Hudson* system for determinating whether a law is criminal or civil in nature, including its use of the seven factors from *Mendoza–Martinez,* is not limited merely to Double Jeopardy contexts. *See e.g. Smith v. Doe,* —— U.S. ——, ——, 123 S.Ct. 1140, 1149, 155 L.Ed.2d 164 (2003) (noting that "the *Mendoza–Martinez* factors are designed to apply in various constitutional contexts ....").

points authorized by G.S. 20–16(c) shall be assigned to the owner or driver of the vehicle nor insurance points as authorized by G.S. 58–36–65." N.C. Gen.Stat. § 160A–300.1(c)(2). The High Point City Ordinance contains a nearly identical portion stating that "[a]ny violation of this section shall be deemed a *noncriminal* violation for which a *civil penalty* of $50.00 shall be assessed, and for which no points authorized by G.S. 20–16(c) shall be assigned to the owner or driver of the vehicle, nor insurance points as authorized by G.S. 58–36.65." High Point, NC., Ordinance No. 00–89, sec. 10–1–36.

Thus, the Court must now consider the seven *Mendoza–Martinez* factors in relation to the statute on its face, and determine whether Plaintiff has presented the "clearest proof" indicating that the Court should "override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Hudson,* 522 U.S. at 100, 118 S.Ct. at 493 (internal quotations omitted).

### 1. Whether the sanction involves an affirmative disability or restraint

The laws at issue do not impose a physical restraint but merely a monetary penalty. Accordingly, the remedy "does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint." *Doe,* —— U.S. at ——, 123 S.Ct. at 1151; *see also Van Harken v. City of Chicago,* 906 F.Supp. 1182, 1191 (N.D.Ill.1995) ("[A] monetary fine limited to $200 is not an affirmative restraint or disability."). Given that the initial civil penalty here is only $50.00, its imposition does not represent an affirmative restraint or disability.

### 2. Whether it has historically been regarded as a punishment

In analyzing this factor the central inquiry "is not whether [the violations themselves] were prosecuted criminally, but whether the *sanctions* imposed were 'punishment.'" *Van Harken,* 906 F.Supp. at 1192. "Monetary assessments have traditionally been imposed under both civil and criminal statutes . . . ." *Id.* (citing *Ward v. Coleman* 598 F.2d 1187, 1193 (10th Cir. 1979), *rev'd on other grounds, United States v. Ward,* 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)); *see also Ward,* 448 U.S. at 256, 100 S.Ct. at 2645 (Blackmun, J., concurring) ("I conclude . . . that monetary assessments are traditionally a form of civil remedy . . . ."). While, as its name implies, the $50.00 "civil penalty" does inflict a punishment by sanctioning violators such as Plaintiff, this factor lends little support to Plaintiff because, as the case law indicates, monetary assessments can be imposed under both civil and criminal statutes and, moreover, they are traditionally viewed as a form of civil remedy.

### 3. Whether it comes into play only on a finding of *scienter*

*Scienter* denotes action taken "knowingly." Black's Law Dictionary 1345 (6th ed.1990). A violation of the ordinance does not require a finding of *scienter,* for no state-of-mind requirement is set out anywhere in the ordinance. Under the heading "Offense," it states simply that "[i]t shall be unlawful for a vehicle to cross the stop line at a system location when the traffic signal for that vehicle's direction of travel is emitting a steady red light, or for a vehicle to violate any other traffic regulation specified in G.S. 20–158." High Point, NC., Ordinance No. 00–89, Sec. 10–1–36. Accordingly, a civil penalty is assessed against any violator of the ordinance without regard to the violator's knowledge or state of mind. In listing its seven factors to be used for determining "whether an Act of Congress is penal or regulatory in character," as explanatory authority for the *scienter* factor, the *Mendoza–Martinez*

Court cited *Bailey v. Drexel Furniture Co.*,[11] 259 U.S. 20, 37–38, 42 S.Ct. 449, 450–51, 66 L.Ed. 817 (1922), a tax case, which observed that "[s]cienters are associated with penalties, not with taxes." Hence, the absence of *scienter* in the present case weighs in favor of finding Defendants' enforcement scheme to be civil, or "regulatory," rather than criminal, or "penal," in nature.

### 4. Whether its operation will promote the traditional aims of punishment-retribution and deterrence

Defendants have put forth significant evidence indicating that the goal of the ordinance is to promote public safety. (*See e.g.* Nandigiri Aff. ¶¶ 3, 11 and Exs. A and B; State of North Carolina's Mem. In Supp. of Mot. to Dismiss and/or Summ. J. and Remand, Ex. 8, ¶ 3.) Thus, as Defendants EDS and Pearson assert, "although the civil fine assessed by the City of High Point surely has some deterrent effect, because the purpose of the ordinance is primarily safety, this factor should weigh in favor of a finding that the ordinance [is] civil in nature." (Resp. of Defs. EDS and Pearson to Pl.'s Mot. for Summ. J., at 6.) Even though the ordinance may have a goal beyond the traditional aims of punishment, Defendants are nevertheless using a tool of deterrence -monetary penalties- to reach that goal. As the City of High Point's own City Attorney wrote in a letter to a Subcommittee of the United States House of Representatives, "[o]ur program is simply an attempt to reduce injuries and property damage caused by red light violators by deterring such behavior . . . ." (*Id.*, Ex. C.) Thus, this is the lone factor that cuts in favor of Plaintiff so as to suggest that the ordinance is criminal in nature to the extent that it has deterrence as one of purposes, therefore promoting one of the traditional aims of punishment.

### 5. Whether the behavior to which it applies is already a crime

There can be no doubt that conduct which violates the High Point ordinance can also be punished, under a separate statutory scheme, as a criminal infraction. However, "the fact that the same infractions are criminal offenses under state law does not transform these civil penalties into criminal penalties." *Gardner v. City of Columbus*, 841 F.2d 1272, 1277 (6th Cir.1988); *see also Ward*, 448 U.S. at 250, 100 S.Ct. at 2642 ("Congress may impose both a criminal and a civil sanction in respect to the same act or omission." (quotation omitted)). Moreover, "the placement of criminal penalties in one statute and the placement of civil penalties in another statute enacted . . . years later tends to dilute the force of the fifth *Mendoza-Martinez* criterion . . . ." *Ward*, 448 U.S. at 250, 100 S.Ct. at 2642. In the present case, criminal penalties for running a red light are contained in N.C. Gen.Stat. § 20–158, while a provision allowing the institution of civil penalties is found in the later-enacted N.C. Gen.Stat. § 160A–300.1. Accordingly, this factor does not weigh in Plaintiff's favor in determining whether the statute and ordinance in the case are civil or criminal in nature.

### 6. Whether an alternative purpose to which it may rationally be connected is assignable for it

As mentioned above in the discussion of factor four, the primary purpose of the ordinance and, by association, the enabling statute, is to promote public safety. As will be discussed below in the context of Plaintiff's equal protection claim, both laws appear rationally connected to advancing this alternative purpose. Moreover, the Supreme Court recently endorsed public safety as a legitimate nonpunitive purpose and found that the mere fact "[t]hat [an]

---

**11.** In the U.S. Reporter this case is titled: *Child Labor Tax Case.*

Act may not be narrowly drawn to accomplish the stated purpose is not dispositive, since such imprecision does not suggest that [an] Act's nonpunitive purpose is a 'sham or mere pretext.' " *Doe,* — U.S. at ——, 123 S.Ct. at 1144 (quoting *Hendricks,* 521 U.S. at 371, 117 S.Ct. at 2087 (Kennedy, J., concurring)). Thus, the goal of promoting public safety is an alternative purpose to which the ordinance and statute may rationally be connected and, therefore, this factor weighs in favor of finding the laws to be civil in nature.

7. Whether it appears excessive in relation to the alternative purpose assigned

Finally, the Court finds the $50.00 civil penalty is not excessive in relation to the alternative purpose of promoting public safety. Historically, persons criminally convicted of running a red light in North Carolina, that is, violating N.C. Gen.Stat. § 20–158, could be assessed a penalty of up to $100.00 and could be assigned driver's license points, as authorized by N.C. Gen.Stat. § 20–16(c), as well as insurance points, as authorized by N.C. Gen.Stat. § 58–36–65. No such points are allowed for violations of ordinances like High Point's that were promulgated pursuant to N.C. Gen.Stat. § 160A–300.1. Further, the initial civil penalty is limited to $50.00, and only if "the owner fails to pay the civil penalty or respond to the citation within the time period specified . . ." may the civil penalty be increased to $100.00. N.C. Gen.Stat. § 160A–300.1(c)(3). As the Seventh Circuit's Judge Posner observed in modifying and affirming the above mentioned *Van Harken* case, in which the plaintiffs raised contentions similar to the present case but, instead, challenged park-

ing tickets, "nothing in the due process clause forbids the reclassification of criminal offenses as civil violations." *Van Harken v. City of Chicago,* 103 F.3d 1346, 1349 (7th Cir.1997). Moreover, "nothing in the Constitution prevents a state from relaxing the conventional safeguards of the criminal process in tandem with a lightening of the penalties." *Id.* (collecting cases). Just such a relaxation of safeguards in tandem with a lightening of penalties has occurred in the present case, and the Court finds that the penalties imposed by the City of High Point as a method of civil enforcement of a criminally prohibited activity are not excessive.

Having thoroughly examined each of the seven *Mendoza–Martinez* factors to determine whether the "statutory scheme [is] so punitive in either purpose or effect . . . as to transform what was clearly intended as a civil remedy into a criminal penalty," *Hudson,* 522 U.S. at 99, 118 S.Ct. at 493 (quotation and citation omitted), the Court cannot say that Plaintiff has met his "heavy burden" of providing "the clearest proof . . . to negate [the legislature's] intention to deem it civil . . . ." *Hendricks,* 521 U.S. at 361, 117 S.Ct. at 2082 (quotations omitted). While the Court is mindful of the fact that the *Mendoza–Martinez* factors are not exclusive or dispositive, they are nonetheless "useful guideposts," *Hudson,* 522 U.S. at 99, 118 S.Ct. at 493, and it therefore seems unnecessary to search for further considerations when six out of the seven factors clearly indicate that the statute and ordinance are civil in nature. Accordingly, the Court finds both High Point City Ordinance § 10–1–306 and N.C. Gen.Stat. § 160A–300.1, the state statute which enabled High Point to enact the ordinance, to be generally [12] civil in

---

12. The Court's use of the word "generally" is intended to acknowledge that, although the statute and ordinance are civil in character and consequently due not suffer from any of the due process infirmities Plaintiff alleges, the laws do have some penal effect. That is, the monetary assessment levied against violators in a civil setting does serve to penalize or

nature.

Although, as mentioned earlier, the crux of Plaintiff's case rests on his contention that the ordinance and statute are criminal in nature, Plaintiff does put forth an additional claim that "[e]ven if completely shorn of its criminal attributes, the resulting, bastardized and so-called civil process transgresses the due process requirements of the Constitution." (Pl.'s Mem. In Supp. of Mot. for Summ. J., at 4.) Thus, Plaintiff faintly argues that the procedures prescribed by the ordinance and statute provide inadequate due process even for civil proceedings. However, Plaintiff only advances arguments regarding what process should be due in criminal settings, and does not suggest what process should be due in a civil setting or analyze whether the process Defendants have provided would be insufficient in a civil setting. Nevertheless, the Court will analyze the basic premise behind Plaintiff's assertion that Defendants' enforcement scheme results in a lack of due process even in civil proceedings.

■ "The test for due process in the sense of procedural minima, . . . requires a comparison of the costs and benefits of whatever procedure the plaintiff contends is required." *Van Harken,* 103 F.3d at 1351 (citing *Mathews v. Eldridge,* 424 U.S.

319, 335, 96. S.Ct. 893, 47 L.Ed.2d 18 (1976)). In the words of the *Van Harken* court, "[t]he use of cost-benefit analysis to determine due process is not to every constitutional scholar's or judge's taste, but it is the analysis prescribed by the Supreme Court and followed by the lower courts . . . ." *Id.* In the present case it is difficult to surmise what procedure Plaintiff contends is required in a civil setting, however the ten specific ways (as listed earlier) in which paragraphs 91a through 91j of his Complaint assert that the statute and ordinance violated his Due Process rights provide some guidance. The Court will address each of Plaintiff's allegations in turn, applying the *Mathews* cost-benefit analysis where appropriate.[13]

■ The initial review of Plaintiff's first contention, that is, that a citation recipient is presumed guilty and responsible for establishing his/her innocence, (*see* Compl. ¶ 91a), reveals that the argument fails because it is premised entirely on an assumption that the statute and ordinance are criminal in nature.[14] Plaintiff's second contention, that citation recipients are denied an opportunity to confront and cross-examine witnesses against them, (*see* Compl. ¶ 91b), is also largely dependant on protections associated only with criminal due process. *See Van Harken,* 103 F.3d

---

punish those individuals. Nevertheless, as the discussion above regarding the fifth *Mendoza–Martinez* factor indicates, the fact that these laws have a penal effect does not automatically convert them from civil to criminal laws.

13. In most instances, the Court will not reach the *Mathews* analysis because the majority of Plaintiff's ten alleged violations are invalid for other, more preliminary reasons.

14. Plaintiff's first allegation also contends, essentially, that Defendants' enforcement scheme "unlawfully places upon [Plaintiff] . . ." the burden of proof. (Compl. ¶ 91a.) In light of the Court's determination that the

scheme is civil in nature, this allegation is meritless. After examining United States Supreme Court jurisprudence regarding allocation of the burden of proof in civil cases the North Carolina Supreme Court concluded that "[w]here . . . no fundamental right is at issue, the allocation of the burden of proof in civil cases is irrelevant to constitutional questions of procedural due process." *Soles v. City of Raleigh Civil Serv. Comm'n,* 345 N.C. 443, 449, 480 S.E.2d 685, 689 (N.C.1997). As will be discussed below in the context of Plaintiff's equal protection claim, no fundamental right is at issue in this case and, therefore, allocation of the burden of proof is irrelevant.

at 1352 ("There is no absolute right of confrontation in civil cases.") (citing *Richardson v. Perales*, 402 U.S. 389, 402, 407, 91 S.Ct. 1420, 1427–28, 1430, 28 L.Ed.2d 842 (1971)). To the questionable extent that live testimony and cross-examination might be so important as to be required by due process in some civil cases, the Court finds this case is not one of them. The costs of such a protection in this instance would surely outweigh the benefits in a setting such as this where Plaintiff was not threatened by the possibility of a criminal conviction, driver's license points, or insurance points. In fact, the most Plaintiff stood to lose, had he timely made use of the appeal procedure and been unsuccessful, was $50.00. *See Van Harken*, 103 F.3d at 1353 ("[W]e must not forget that the maximum penalty that they are empowered to impose is only $100. The less that is at stake, other things being equal, the less process is due; that is the teaching of *Mathews*."). Given that the maximum penalty here is only $50.00, *Mathews* would not require as extensive a level of due process.

Similarly, Plaintiff's seventh, eighth, and tenth contentions (*see* Compl. ¶¶ 91g, 91h, 91j) presume a criminal setting. Each is founded on the notion that a violation of the ordinance is equivalent to a declaration of "guilt." Because the enforcement scheme is civil in character, violators of the ordinance are not subject to a criminal determination of "guilt" or "innocence," they are merely assessed a civil penalty and afforded a chance to contest it. Moreover though, even when considered in the context of a civil setting, the substance of each of these three claims is of little merit to Plaintiff's argument that he was denied due process.

Specifically, paragraph 91g of the Complaint contends that it is a violation of due process to base "a presumption of guilt ..." on photographic technology that "fails more often than not ...." " In support of this assertion Plaintiff attached to his Complaint a document, generated by Defendants, entitled "Site Activity Report For Date Feb. 15, 2001 through May 20, 2001," which contains a column labeled "% failed" beneath which there is a total number of "59." Defendants contend that the label, "% failed," which is assigned to this figure is essentially a misnomer and that "more photographs are taken than citations issued because of the review process for each photograph." (City Defs.' Br. In Supp. of their Mot. for Summ. J., at 9.) Effectively then, the 59% figure reflects a screening process, whereby illegible license plates or violations with "an obvious legitimate explanation ... such as a right turn on red or a funeral procession ..." are tossed out before becoming citations. (*Id.*, at 10.) Defendants maintain this "insures that only clear red light violations result in citations ...." (*Id.*) Defendants' logic is persuasive. It is entirely within Defendants' province to be selective by choosing to pursue enforcement of only the cases where they perceive an obvious violation.

As for paragraph 91h, which asserts that "[r]equiring Plaintiff to pay an appeal bond prior to any formal adjudication of guilt or financial responsibility violates ... due process ...," appeal bonds are regularly required and have been approved in various contexts. "Legislatures, except where inhibited by Constitutional mandate, have had the power generally to regulate appellate procedure, including the authority to require the giving of a bond as a condition precedent to the consummation of an appeal." *Patterson v. Warner*, 371 F.Supp. 1362, 1364 (S.D.W.Va.1972) (citing 4A C.J.S. Appeal & Error § 502, p. 208); *see also* N.C.R.App. P. 6(a) ("Except in pauper appeals an appellant in a civil action must provide adequate security for the costs of appeal ....."); Fed. R.App. P. 7 ("In a civil

case, the district court may require an appellant to file a bond or provide other security in any form and amount necessary to ensure payment of costs on appeal."); *and* 16A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3953 (3d ed. 1999) ("It is discretionary with the district court whether to require a bond or other security for costs on appeal, and if there is a bond the amount is wholly up to the district court."). In enforcing such a rule of appellate procedure, the North Carolina Supreme Court has stated that "[g]iving bond on appeal or the granting [of] leave to appeal without bond are jurisdictional, and, unless the statute is complied with, the appeal is not in this court ...." *Brown v. S.H. Kress & Co.*, 207 N.C. 722, 178 S.E. 248, 249 (1935) (quotation omitted). Such bonds are often required to ensure that payment of costs directly related to the court proceedings, such as copying charges, will be covered, *see* Fed. R.App. P. 39, but even bonds constituting "a penalty double the amount of the judgment, ... with condition to the effect that the person proposing to appeal will perform and satisfy any judgment which may be rendered against him on such appeal ..." have been approved. *Warner*, 371 F.Supp. at 1364 (quotation omitted). Thus, the requirement in the present case that citation recipients post a $50.00 bond in order to proceed with an appeal is valid.

Paragraph 91j of the Complaint alleges that "[t]he presumption of guilt and accompanying requirement to pay a penalty of $50.00 is an unlawful taking of property without due process ...." Quite simply, Plaintiff has suffered no "unlawful taking" because he never paid his citation, or any amount assessed against him in connection with the citation he was issued; nor has the City of High Point exercised its authority to "enforce the penalties by a civil action in the nature of a debt." High Point, NC., Ordinance No. 00–89, Sec. 10–1–36. Therefore, Plaintiff has no standing to raise such a claim because the City of High Point has not "taken" any of his property.[15]

Of the remaining five contentions set forth within the subparts of paragraph 91 of Plaintiff's Complaint, three must be disposed of because they are wholly unsupported by the evidence and do not present any genuine issues of material fact. These are paragraphs 91d, 91e, and 91f. Specifically, paragraph 91d contends that "[t]he closed appeal hearing violates the right[ ] of Plaintiff ... to a fair hearing process ... in violation of ... due process ...." Contrary to this assertion, the City has produced evidence indicating that the appeal process is, in fact, open to the public and that no one has ever been denied access to a hearing. (*See* Affidavit of Sreekanth Nandagiri, Transportation Operations Manager for the City of High Point [Document # 25], ¶ 9.) Beyond the Complaint's initial charge, Plaintiff has not disputed this evidence or offered anything to counter it. In this instance, "[t]hough the burden of proof rests initially with the moving party, when a motion for summary judgment is made and supported as provided in Rule 56, the nonmoving party must produce 'specific facts showing that there is a genuine issue for trial,' rather than resting upon the bald assertions of his pleadings." *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985) (quoting Fed.R.Civ.P. 56(e)), *over-*

---

15. Even if Plaintiff did have standing, any alleged "taking" of the $50.00 civil penalty would only have occurred after notice and an opportunity, upon posting $50.00 as a bond, for a hearing. Here again, the Court is satisfied that this level of due process is sufficient when analyzed from a *Mathews* cost/benefit standpoint. *Van Harken*, 103 F.3d at 1353 ("The less that is at stake, other things being equal, the less process is due ....").

*ruled on other grounds by, Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Accordingly, the Court finds the allegations of paragraph 91d to be unsupported and therefore insufficient to withstand Defendants' Motions for Summary Judgment.

Similarly, paragraph 91e, which alleges that "[t]he method of selection, training and compensation of [the] hearing officers ... have destroyed their ability to perform impartially, all in violation of ... due process ...," is not supported by the record. First, there is nothing about the compensation of the hearing officers that would interfere with their impartiality; they are paid a flat rate of $25.00 for every appeal they hear, regardless of outcome. (*See* Nandagiri Aff. ¶ 10.) As for the method of selection and training of the hearing officers, Plaintiff has not presented *any* evidence as to how the officers are selected and trained, much less evidence that such methods somehow impinge upon the officers' impartiality.[16] This does not satisfy Plaintiff's "difficult burden" of overcoming the "presumption of honesty and integrity" afforded to both administrative agencies

which adjudicate, as well as to courts. *Withrow v. Larkin,* 421 U.S. 35, 46–47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). Here again, because Plaintiff has not produced specific facts to support it, paragraph 91e cannot survive Defendants' Motion for Summary Judgment.

Finally paragraph 91f, in asserting that "[t]he presentation, handling, managing and commenting on appeals in an adversary hearing ... by Defendants EDS and Pearson, who have a direct financial interest in each appeal heard, constitutes the unauthorized practice of law, which *ipso facto,* violates Plaintiff's substantial right to due process ...," also fails due to an absence of evidentiary support. All that the evidence has shown is that the particular Defendants to whom Plaintiff refers participate in hearings only to the extent of supplying, if needed, the original photographs taken and serving, also only when needed, as expert witnesses in explaining the operation of the traffic control photographic system. (*See* EDS and Pearson's Br. in Supp. of Mot. for Summ. J., Ex. 7.) There is no evidence that, by performing these limited administrative functions, Defendants have violated Plaintiff's right to Due Process.[17] Thus, as with paragraphs

**16.** Even if Plaintiff had presented some evidence illustrating the methods by which the hearing officers were hired and trained, it is doubtful that such evidence could cast a dark cloud over the presumption of adjudicative reliability of the hearing officers. *See e.g. Van Harken,* 103 F.3d at 1352–53 (where hearing officers were hired by, and could be fired at will by, the City's Director of Revenue the Court stated: "we do not think that the adjudicative reliability of the hearing officers is fatally compromised by the manner of their appointment and by their lack of secure tenure.").

**17.** With regard to Plaintiff's contention that these particular Defendants have "a direct financial interest in each appeal heard," the Fourth Circuit has concluded the mere fact that an administrative or adjudicative body derives a financial benefit from fines or penalties that it imposes is not, in general, a viola-

tion of due process. *Doolin Sec. Sav. Bank, F.S.B. v. FDIC,* 53 F.3d 1395, 1405–07 (4th Cir.1995). This is true except in instances where "the decisionmakers st[and] to gain substantial, personal pecuniary benefits from their adjudicative decisions." *Id.* at 1406.

Allowing great leeway to Plaintiff's logic, his theory is essentially that Defendants EDS and Pearson have taken on some sort of advocacy role to ensure that citations which are contested -which, it should be noted, make up only a fraction of the number of citations issued, since the rest are paid without contest are upheld *so the City will not lose revenue* and, presumably, have to ultimately defund the program as a result, thereby costing EDS and Pearson their jobs. Here again, the *Van Harken* case, although it refers to the hearing officers themselves, addresses this argument and provides directly applicable reasoning:

   If [the hearing officers'] very indirect, very tenuous stake (a fear that if a hearing offi-

91d and 91e, the evidence has not borne out the allegations of paragraph 91f so as to create a genuine issue of material fact that would warrant a denial of Defendants' Motions for Summary Judgment.

Only two subparts of paragraph 91 remain to be discussed. Paragraph 91c asserts that "[t]he printed appeal form ... severely, unreasonably, arbitrarily and capriciously limits and restricts, to an impermissible and unconstitutional degree, the right to present issues on appeal." The Court does view the three and a half short lines, and the appeal form's accompanying mandate that "[o]nly those reasons written above [on the three and a half lines] can be argued at the administrative hearing ...," as rather constrictive. Nevertheless, as mentioned above, a legislative body may generally regulate appellate procedure as it sees fit. *Patterson,* 371 F.Supp. at 1364. Here, the evidence indicates that Defendants, contrary to what the potentially restrictive appeal form states, in fact permit citation appellants to attach separate sheets setting forth additional grounds. (*See* Nandagiri Aff. ¶ 9.) In past hearings the hearing officers have always considered such submissions. (*Id.*) Thus, despite possible outward indications to the contrary, Defendants' limitations on the appeals process do not, as a matter of law, actually place severe, unreasonable, arbitrary or capricious limits and restrictions on Plaintiff's right to present issues on appeal.

■ The sole remaining specific allegation is contained in paragraph 91i which contends that "[t]he failure to provide for a system of indigent appeals violates the rights of indigent persons, for whom Plaintiff brings this claim ...." As a prelimi-nary matter, Plaintiff is not indigent and has the means to pay the penalties that have been assessed against him. (*see* Pl.'s Resp. to Req. for Admis. 6, 7.) In addition, there has been no determination that Plaintiff is able to bring the case on behalf of indigents because class certification has not yet been granted in this case. Even beyond a lack of standing though, Plaintiff cannot succeed on this claim because "[i]t has been long held that an appeal *in forma pauperis* is a privilege and not a right, and refusal to grant the right to appeal does not offend requirements of due process." *Rae v. Tyler,* 1992 WL 391344, at *1 (D.D.C. Dec. 10, 1992) (citing *Dorsey v. Gill,* 148 F.2d 857 (D.C.Cir.1945), *cert. denied* 325 U.S. 890, 65 S.Ct. 1580, 89 L.Ed. 2003 (1945); *Parsell v. United States,* 218 F.2d 232 (5th Cir.1955)). Thus, a grant of summary judgment against this claim is appropriate.

To summarize, with respect to Plaintiff's due process claim, the Court will grant Defendants' Motions for Summary Judgment against this claim for a number of reasons. First, because Plaintiff failed to avail himself of any of the procedural processes Defendants made available, he lacks standing to challenge such processes. More fundamentally though, even if Plaintiff did have standing, the foundational premise of his claim is fatally flawed in light of the unavoidable conclusion that the statute and ordinance are civil in nature. Finally, after analyzing each of Plaintiff's ten specific contentions to determine whether the process provided is sufficient in a civil setting, the Court has concluded that, in each instance, due process is adequately afforded to citation recipients.

---

cer lets off too many alleged parking violators, the Director of Revenue may get angry and fire him) were enough to disqualify them on constitutional grounds, elected judges, who face significant pressure from the electorate to be "tough" on crime, would be disqualified from presiding at criminal trials, especially in capital cases. They are not.

*Van Harken,* 103 F.3d at 1353.

## C. State and Federal Equal Protection Claim

In his equal protection claim Plaintiff contends that "[t]he Statute, Ordinance, and conduct complained of create two classes of offenders who are alleged to have violated the same statute and committed the same conduct; one class is afforded a trial, and the other class, of which Plaintiff is a member, is not." (Compl.¶ 95c.) Plaintiff brings this claim under both the "Equal Protection Clause of the Fourteenth Amendment to the United States Constitution ...." and, purportedly pursuant to, the " 'law of the land' provision of the Constitution of North Carolina, Art. I, sec. 19 ...." [18] (Compl.95.)

■ North Carolina's Equal Protection Clause is "functionally equivalent to the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States." *White v. Pate*, 308 N.C. 759, 765–66, 304 S.E.2d 199, 203 (1983). In *White*, the North Carolina Supreme Court analyzed "the Equal Protection Clause of Art. I, § 19 of the Constitution of North Carolina ...." *Id.* Ultimately, the *White* case demonstrates that North Carolina courts engage in the same analysis of equal protection claims under the North Carolina Constitution as do federal courts when analyzing a federal equal protection claim. *Id.; see also Tri–County Paving*, 281 F.3d at 435 n. 6 (recognizing that North Carolina courts do not distinguish between equal protection and due process claims under the Fourteenth Amendment and the North Carolina Constitution.) As abundant holdings plainly decree, equal protection analysis is none too searching in most instances. "Like the analysis used in evaluating the constitutionality of ... legislation under the Due Process Clause, an analysis of ... legislation under the Equal Protection Clause is a deferential one. 'In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' " *Beales*, 278 F.3d at 351 (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993)).

■ Here, Plaintiff has not identified any fundamental right allegedly abridged by the statute or ordinance nor has he alleged membership in any suspect class. This stands to reason, because his only alleged deprivation is the potential deprivation of the $50.00 civil penalty. Thus, the proper standard for review is rational basis, that is, the Court must determine "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993). In making this determination, "a classification [such as the one at bar] neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Id.* at 319, 113 S.Ct. at 2642. Moreover, "a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification. Instead, a classification must be upheld against equal protection challenge if there is any reasonably con-

---

18. The Court will afford Plaintiff the benefit of the doubt by assuming his reference to the North Carolina Constitution was intended to be to its Equal Protection Clause, which is contained in Article I, Section 19, rather than its "law of the land" provision which is also contained in that section but, as *Petition of Smith*, 82 N.C.App. 107, 109, 345 S.E.2d 423, 425 (1986) (citing *In re Moore's Sterilization*, 289 N.C. 95, 221 S.E.2d 307 (1976)) points out, "is synonymous with 'due process of law' ...."

ceivable state of facts that could provide a rational basis for the classification." *Id.* at 320, 113 S.Ct. at 2642 (internal citations and quotations omitted).

Plaintiff falls far short of surmounting the formidable presumption of validity bestowed upon the statute and ordinance by the rational basis review standard. One need not look any further than the evidence Plaintiff himself has presented which indicates there is public disagreement over whether the classification he has identified is rationally related to the government's legitimate objective of promoting safety. (*See* Pl.'s Resp. in Opp'n to Mot. for Summ. J. of Defs. City of High Point, et. al., Exs. A, B, C, D.) The fact that such a disagreement exists is an obvious indication that a "reasonably conceivable state of facts" must have existed to cause the legislative bodies to conclude that creating these two classes of violators for purposes of enforcing N.C.G.S. § 20–158 would promote public safety. Plaintiff's personal disagreement with these facts is of no consequence. As the Supreme Court made abundantly clear in *Heller*, "[a] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. A statute is presumed constitutional, ... and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it ...." *Id.* at 320, 113 S.Ct. at 2643 (internal citations and quotations omitted). This, Plaintiff has not done. Accordingly, Defendants are entitled to summary judgment as to Plaintiff's equal protection claim.

### D. State Law Claims: Claim Three, Claim Five, and Claim Six

As this case was originally filed in state court and subsequently removed to this Court, the Court's jurisdiction over the matter is governed, in part, by 28 U.S.C. § 1441. Within this removal stat-

ute, consideration is specifically given to the authority of federal courts to remand independent state causes of action which have been removed along with federal questions. The statute provides:

> Whenever a separate and independent claim or cause of action within the jurisdiction conferred by section 1331 of this title is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which State law predominates.

28 U.S.C. § 1441(c). 28 U.S.C. § 1367(c) also speaks directly to the issue with its provision that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction."

Aside from the claims already discussed that are directly before this Court as a result of "federal question" jurisdiction, Plaintiff brings three claims based entirely on the Constitution and laws of North Carolina. Claim Three asserts that "N.C. Gen.Stat. § 160A–300.1, unlawfully fails to provide for a proper system of appeals in connection with the procedure afforded to Plaintiff, in direct violation of the Constitution of North Carolina, Art. IV, § 12(6) ..." and that "the North Carolina General Assembly has unlawfully delegated to the City of High Point the means and methods of establishing the appeal of citations ...." (Compl.¶¶ 97, 98.) Claim Five, entitled "Unlawful Taxation," contends that "[t]he acts, means, methods, scheme, policy and custom established by N.C. Gen.Stat. § 160A–300.1, Sec. 10–1–306 of the High

Point City Code of Ordinances and the contract between Defendant City of High Point and Peek and the concerted actions of Defendants, under color of law, constitute[ ] an illegal use of the police power for the generation of revenue." Claim Six alleges a violation of Article I, Section 6 of the North Carolina Constitution, which provides that "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. The claim contends that the statute "operates with [the] Ordinance ... in such a manner as to unlawfully combine and intertwine powers which the [North Carolina] Constitution requires to be maintained separately." (Compl.¶ 112.)

In its role as an intervening party, the State of North Carolina asserts that the aforementioned state claims "do not contain any federal questions; but are a challenge to a state statute that has not been interpreted by any state court of record." (State of N.C.'s Mem. In Supp. of Mot. to Dismiss and/or Summ. J. and Remand, at 12.) The State therefore "requests that this Court exercise its discretionary authority to remand the independent state claims to the state court for determination." Finding this request to be based on sound legal reasoning, the Court will therefore remand Plaintiff's state law claims, numbered Claim Three, Claim Five, and Claim Six in the Complaint, to the appropriate state court for further determination, if necessary.

Claims Three, Five, and Six raise novel or complex issues of North Carolina law [19] and, in light of the Court's grant of summary judgment against Plaintiff's federal-

ly-based claims, and consequent dismissal of those claims, these independent state claims now predominate. As such, this case is procedurally indistinguishable from *Hinson v. Norwest Fin. South Carolina, Inc.*, 239 F.3d 611 (4th Cir.2001). There, the Fourth Circuit determined that after disposition of the federal claims which gave the district court jurisdiction, state claims predominated. The court applied the provisions of 28 U.S.C. § 1367(c) and found the combination of factors sufficiently compelling to justify remand because, as it concluded, "[t]he federal claim in this case had been disposed of ... and State claims predominated .... Moreover, the State claims involved interpretations of complex [State] statutes on which there was no State precedent." *Hinson*, 239 F.3d at 617.

Accordingly, the Court will follow the principles enumerated in *Hinson* and the directly relevant federal statutes, and remand claims Three, Five, and Six to the General Court of Justice, Superior Court Division, Guilford County, North Carolina.

**E. Alternative Claim: Unlawful and Unconstitutional Diversion of Fines and Penalties**

Plaintiff's alternative claim alleges that "Defendant City of High Point has failed to remit any portion of the fines to Defendant Guilford County Board of Education as required by N.C. Const. Art. IX, § 7 ..." and, the claim further asserts, the Board "is entitled to receive the 'clear proceeds' of all penalties and forfeitures and of all fines *lawfully* collected by Defendant City of High Point." [20] (Compl. ¶¶ 116, 117 (emphasis in original).)

---

**19.** In addition, the statute and ordinance in question have not been tested within any of this state's courts of record and, therefore, no North Carolina case precedent exists to speak to the issues raised in these three claims.

**20.** Unlike the three claims discussed in the previous section, the alternative claim does not raise any novel or complex issues of state law. Moreover, as will be discussed, several North Carolina courts have examined the constitutional provision at issue in the alter-

■ As a preliminary matter, the Court must point out that Plaintiff does not personally have standing to bring this claim. In *Fuller v. Easley*, 145 N.C.App. 391, 553 S.E.2d 43 (2001), the plaintiff attempted to bring suit on behalf of the Wake County Board of Education arguing that the board was entitled to certain funds pursuant to Article IX, Section 7 of the North Carolina Constitution. The court of appeals explained that an individual may bring suit "on behalf of a public agency or political subdivision, if the proper authorities neglected or refused to act." *Fuller*, 145 N.C.App. at 395, 553 S.E.2d at 46 (quotations omitted). The court instructed that, in order to satisfy this standing requirement, an individual must allege that "(1) there has been a demand on and refusal by the proper authorities to institute proceedings for the protection of the interests of the political agency or political subdivision; or (2) a demand on such authorities would be useless." *Id.* at 395–96, 553 S.E.2d at 47 (quotation omitted). In the present case, not only has Plaintiff failed to allege either of these, he cannot so allege because there has not been a "refusal by the proper authorit[y] to institute proceedings for the protection of [its] interests . . . ." *Id.* Quite to the contrary, the Guilford County Board of Education, i.e. the "proper authority," has taken action to protect its interests by filing an Answer [Document # 13] to Plaintiff's Complaint requesting a declaratory judgment that the City of High Point is required by Article IX, Section 7, to pay to the Board all clear proceeds of the amounts received by High Point pursuant to N.C. Gen.Stat. § 160A–300.1 and High Point Ordinance § 10–1–306. The Board then filed a Motion for Partial Summary Judgment seeking a "finding that all clear proceeds—both past and (if the statute and ordinance are upheld) future—collected by High Point must be paid to the Board." (Guilford County Board of Education's Mem. In Supp. of Mot. for Partial Summ. J., at 3.) Therefore, this portion of the Opinion will address the Board's request for a declaratory judgment, which is before the Court pursuant to the Board's Motion for Summary Judgment, rather than addressing the claim as brought by Plaintiff.

Defendants' response to the Board's Motion argues that Article IX, Section 7 does not control "[b]ecause the civil penalties collected by the City for violations captured by its traffic control photographic system do not result from any breach of the penal laws *of the State* . . . ." (City Defs.' Resp. in Opp'n to Guilford County Bd. of Educ.'s Mot. for Partial Summ. J., at 3 (emphasis supplied).) Specifically, the

native claim and have provided clear guidance in how to interpret/apply the provision. Therefore, the Court will again exercise its discretion and, in this instance, retain jurisdiction to rule upon the relatively straight forward issue raised in the alternative claim. The considerations of judicial economy, convenience, and fairness support the Court's decision in this regard. *See Dula v. McPherson*, 1999 WL 1939238, at *2 (M.D.N.C. Aug.4, 1999) ("The discretionary determination whether to exercise supplemental jurisdiction is based on a consideration of judicial economy, convenience, fairness and comity.") (citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988); *In re Conklin*, 946 F.2d 306, 324 (4th Cir.1991)); *see also Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir.1995) ("The doctrine of supplemental jurisdiction indicates that federal courts generally have discretion to retain *or* dismiss state law claims when the federal basis for an action drops away." (emphasis in original)); *and In re Commonwealth Oil/Tesoro Petroleum Corp. Securities Litigation*, 467 F.Supp. 227, 247–48 (W.D.Tex.1979) (dismissing two pendent state claims, but retaining jurisdiction over two others where it found with regard to the second two state claims that "[t]he factual allegations . . . are closely tied to . . . [the] federal claims . . . . [and the] state claim neither predominates over the federal claim . . . nor significantly broadens the scope of this case.").

City Defendants contend that, because "the state authorizing statute specifically provides that any red light violation captured by the City's traffic control photographic system is not a breach of the penal laws of the State ..." and, thus, violations are "only a breach of City Ord. § 10-1-306," the City is therefore "entitled to retain the proceeds of all civil penalties collected for violations of City Ord. § 10-1-306." (*Id.* at 4.)

Turning first to the provision at issue, Article IX, Section 7 of the North Carolina Constitution reads in its entirety:

All moneys, stocks, bonds, and other property belonging to a county school fund, and *the clear proceeds of all penalties and forfeitures* and of all fines collected in the several counties for any breach of the penal laws of the State, shall belong to and remain in the several counties, and *shall be faithfully appropriated and used exclusively for maintaining free public schools.*

N.C. Const. art. IX, § 7 (emphasis supplied).

North Carolina's courts have had several occasions to interpret and apply Article IX, § 7. Most instructive to the issue presently before the Court is *State ex rel. Thornburg v. 532 B Street,* 334 N.C. 290, 432 S.E.2d 684 (1993). *Thornburg* involved a forfeiture proceeding under North Carolina's RICO Act which provides that "[f]orfeiture shall be had by a *civil procedure* known as a RICO forfeiture proceeding." N.C. Gen.Stat. § 75D-5(a) (emphasis supplied). There the North Carolina Supreme Court examined "how the proceeds of a sale of the forfeited property shall be distributed in light of Section 7 of Article IX of the North Carolina Constitution." *Thornburg* at 291, 432 S.E.2d at 684. The court's holding repeated the conclusion of an earlier case by stating:

"We interpret the provisions of Section 7 relating to the clear proceeds from penalties, forfeitures and fines as identifying two distinct funds for the public schools. These are *(1) the clear proceeds of all penalties and forfeitures in all cases, regardless of their nature, so long as they accrue to the state;* and (2) the clear proceeds of all fines collected for any breach of the criminal laws .... *Thus, in the first category, the monetary payments are penal in nature and accrue to the state regardless of whether the legislation labels the payment a penalty, forfeiture or fine or whether the proceeding is civil or criminal."*

*Thornburg,* 334 N.C. at 294, 432 S.E.2d at 686 (quoting *Mussallam v. Mussallam,* 321 N.C. 504, 508-09, 364 S.E.2d 364, 366-67 (1988)) (emphasis supplied by *Thornburg* court). Thus, the first category of Article IX, Section 7, as described by the *Thornburg* court, applies to both civil and criminal cases and takes effect whenever "monetary payments are penal in nature and accrue to the state ...." *Id.*

Therefore, because the Court has already determined that the City of High Point's enforcement scheme is civil in nature, the Article IX, Section 7 issue now before the Court involves the two part inquiry, described in category one of *Thornburg,* of deciding whether the "monetary *payments* are penal in nature and accrue to the state ...." *Id.* (emphasis supplied) First, as to whether the payments are penal in nature, the North Carolina Supreme Court has elaborated that "it is neither the label attached to the money nor the collection method employed, but the *nature of the offense* committed that determines whether the payment constitutes a penalty." *Craven County Bd. of Educ. v. Boyles,* 343 N.C. 87, 92, 468 S.E.2d 50, 53 (1996) (quotations omitted). In the present case, although the Court recognizes that the label is not

determinative, it is worth noting that the assessment is labeled a "civil penalty" in both the statute and ordinance. More definitively though, as discussed earlier, a goal of this assessment is to promote a traditional aim of punishment, namely, deterrence. Thus, the "nature of the offense committed" is a violation of a local ordinance which attempts to deter individuals by sanctioning them, through monetary assessments levied in a civil setting, to thereby discourage them from engaging in an activity that violates N.C. Gen.Stat. § 20–158. Therefore, the monetary *payments themselves,* though levied pursuant to an enforcement scheme that is civil in nature, serve as punishment for the act of running a red light and, accordingly, are "penal in nature" for the purposes of *Thornburg.*

Nevertheless, in this case it is the second part of *Thornburg*'s category one inquiry that is determinative because the Court finds that the monetary payments at issue do not "accrue to the state." The Board's position on this issue relies on the principle that "[a] municipality acting in its governmental capacity is an agency of the State for the better government of those residing within its corporate limits ...." *Candler v. City of Asheville,* 247 N.C. 398, 406, 101 S.E.2d 470, 476 (1958). However, the Board's reasoning includes a second step, in which it argues that "[a]s agents and instrumentalities of the State, a municipality's penalties constitute penalties by 'the State' for the purposes of Article IX, Section 7." (Guilford County Bd. of Educ. Reply to Defs.' Resp. in Opp'n to Partial Summ. J., at 3.) North Carolina law does not support such a conclusion.

Long ago the North Carolina Supreme Court interpreted the phrase "accrue to the state" as it was used in "[t]he constitution of 1868 (Art. IX, § 4) ...." *Commissioners of Wake v. City of Raleigh,* 88 N.C. 120 (1883). Article IX, section 4 was a provision that appropriated, "for the estab-

lishing and perfecting of free public schools, 'the net proceeds *that may accrue to the state* from sales of estrays, or from fines, penalties and forfeitures.'" *Id.* (quoting N.C. Const. art. IX, § 4) (emphasis added by *Wake* court). In *Wake,* the court concluded "that the appropriation in the constitution does not extend to fines, penalties or forfeitures ... arising in the enforcement of ordinances and rules adopted by a municipal corporation for local government. They do not '*accrue to the state* ....'" *Id.* (emphasis added by *Wake* court). Thus, penalties arising solely from the enforcement of local ordinances do not "accrue to the state."

A few years after *Wake,* the North Carolina Supreme Court decided *Bd. of Educ. of Vance County v. Town of Henderson,* 126 N.C. 689, 36 S.E. 158 (1900), a case in which "[t]he plaintiff ... allege[d] that defendant ... collected, and [had] in its treasury, a large amount of money collected from fines and penalties belonging to the public-school fund of said county, which defendant refuse[d] to account for and pay over to plaintiff." There the court pointed out that "[a] municipal corporation has the right, by means of its corporate legislation, commonly called 'town ordinances,' to create offenses, and fix penalties for the violation of its ordinances, and may enforce these penalties by civil action; but it has no right to create criminal offenses." *Town of Henderson,* 126 N.C. 689, 36 S.E. at 159. The court then explained that historically "it was found to be almost impossible to administer and enforce a proper police government in towns and cities by means of penalties [recovered in a civil action of debt] alone. It therefore became necessary to make the violation of town ordinances a misdemeanor, -a criminal offense, -which was done by section 3820 of the [North Carolina] Code ...." *Id.* With this foundation in mind, the court turned to then-existing Article IX, Section 5 of the

North Carolina Constitution which, similar to its modern day counterpart, decreed that " 'the clear proceeds of all penalties and forfeitures, and of all fines collected in the several counties for any breach of the penal ... laws of the state; ... shall belong to and remain in the several counties, and shall be faithfully appropriated for establishing and maintaining free public schools in the several counties of the state.' " *Id.* (quoting N.C. Const. art. IX, § 5). Based on this constitutional provision, the court concluded that "[i]t must therefore follow that all the fines the defendant has collected upon prosecutions for violations of the criminal laws of the state, whether for violation of its ordinances made criminal by section 3820 of the Code or of other criminal statutes, belong to the common-school fund of the county." *Id.* However, the court explained, "[t]his is not so with regard to 'penalties' which the [city] may have sued for and collected out of offenders violating its ordinances. These are not penalties collected for the violation of a law of the state, but of a town ordinance." *Id.* Thus, penalties levied merely for violation of a local ordinance are wholly distinct from those collected for violation of a law of the state.[21]

Finally, in *Cauble v. City of Asheville,* 301 N.C. 340, 271 S.E.2d 258 (1980), the North Carolina Supreme Court relied on *Henderson* because the court again faced a situation in which the act of violating a local ordinance was, *ipso facto,* a state criminal violation.[22] The court described

"[t]he inquiry addressed by the *Henderson* Court" as "whether the monies in dispute were collected for violations of the criminal laws of the State or for violations of city ordinances." *Cauble,* 301 N.C. at 344, 271 S.E.2d at 261. *Cauble* held that precisely the same result would ensue in its situation as that which unfolded in *Henderson* wherein "[t]he Court determined that, since G.S. 14–4 makes violation of city ordinances misdemeanors, the sums in question were collected for breach of the State's penal laws." *Id.* at 344–45, 271 S.E.2d at 261. Thus, even in modern North Carolina Supreme Court decisions that have engaged in Article IX, Section 7 analysis, there remains a sharp distinction between penalties levied for a violation of a local ordinance and those collected for violation of a law of the state.

This distinction was reflected in *Henderson* and *Cauble* by the need to determine what constituted a "penal law of the State" for purposes of Article IX, Section 7. Since then the North Carolina Supreme Court has broadened Article IX, Section 7's application by identifying in *Mussallam,* and later reiterating in *Thornburg,* the principle that Section 7 actually creates "two distinct funds" for the public schools, namely, "(1) the clear proceeds of all penalties and forfeitures in all cases, regardless of their nature, so long as they accrue to the state; and (2) the clear proceeds of all fines collected for any breach of the criminal laws ...." *Thornburg,* 334 N.C. at 294, 432 S.E.2d at 686 (quoting *Mussallam,* 321 N.C. at 508–09, 364

---

**21.** As the Board points out, *Commissioners of Wake* and *Henderson* dealt with different versions of the North Carolina Constitution than the one which now governs. However, the version of the Constitution is irrelevant because this Court is only relying on these two cases for guidance in interpreting the phrase "accrue to the state." As illustrated by its use in the *Thornburg* decision, this phrase still has direct relevance to the application of Article

IX, Section 7 just as it did with previous versions of that constitutional provision.

**22.** In *Cauble* the statute which made violation of town ordinances into a state criminal offense was N.C. Gen.Stat. § 14–4 which, as the *Cauble* court pointed out, is the modern version of "section 3820," the statute that governed in *Henderson. Cauble,* 301 N.C. at 343, 271 S.E.2d at 260.

S.E.2d at 366–67). Therefore, simply determining what constitutes a "penal law of the State," as the *Henderson* and *Cauble* decisions interpreted that phrase, is no longer sufficient to identify every type of fund that may fall within Article IX, Section 7's application. Nevertheless, *Henderson* and *Cauble* are significant to the present case simply because they highlight the fact that a distinction does indeed exist between monetary penalties levied for a violation of a local ordinance and those collected for violation of a law of the state. Thus, despite the fact that municipalities are agents and instrumentalities of the State, a municipality's penalties do not automatically constitute penalties that "accrue to the State" for the purposes of Article IX, Section 7 as the Board suggests.

In the present case, the civil penalty assessed pursuant to High Point City Ordinance § 10–1–306 is of the type described in *Henderson*. As the North Carolina Supreme Court there stated, "[a] municipal corporation has the right, by means of its corporate legislation, commonly called 'town ordinances,' to create offenses, and fix penalties for the violation of its ordinances, and may enforce these penalties by civil action; but it has no right to create criminal offenses."

*Henderson*, 126 N.C. 689, 36 S.E. at 159. This is exactly what the City of High Point has done in passing § 10–1–306. Although the ordinance punishes activity which may also be punished criminally by the State, the ordinance itself levies only civil penalties and expressly states that the city can only "enforce the penalties by a civil action in the nature of a debt." High Point, NC., Ordinance No. 00–89, sec 10–1–306(c). Accordingly, the penalty assessed by this ordinance accrues directly to the City of High Point and only the City of High Point may enforce it. Thus, in this setting, the fact that High Point is a "creature of the state" does not, as the Board suggests, indicate that any monetary penalty High Point assesses thereby "accrues to the state." [23]

In summary, the Court has concluded that the assessments in question constitute monetary payments which, although levied in a civil setting, are "penal in nature," as that phrase has been interpreted by the North Carolina Supreme Court. Nevertheless, they do not "accrue to the state." Therefore, the "civil penalties" assessed by the City of High Point are not subject to the requirements of Article IX, Section 7 of the North Carolina Constitution. Accordingly, the Court will deny Defendant

---

**23.** The Court further takes note of two, recently enacted statutes which, like N.C. Gen. Stat. § 160A–300.1, serve as enabling legislation allowing particular municipalities to pass ordinances that provide for photo-light enforcement systems. Specifically, N.C.G.S. § 160A–300.2 and N.C.G.S. § 160A–300.3 allow red light cameras in Wake County and the City of Concord, respectively. These statutes are similar to the earlier-enacted § 160A–300.1, but they both contain various additional provisions not found in § 160A–300.1. The most significant of these additional provisions, in terms of relevance to the issue currently before the Court, states that "[t]he clear proceeds from the citations issued pursuant to the ordinance authorized by this section shall be paid to the county school fund."

N.C. Gen.Stat. §§ 160A–300.2(g), 160A–300.3(f). Hence, in these most recent versions of photo-light enforcement enabling legislation, the North Carolina General Assembly found it necessary to specifically instruct that clear proceeds generated from these enforcement programs must be paid to the county school funds of the counties to which the two statutes apply. Presumably then, the General Assembly recognized that § 160A–300.1, in its present form, would not be subject to such a requirement. It is not for this Court to theorize as to why the General Assembly saw fit to add this requirement to the new statutes and not institute a similar decree governing § 160A–300.1, the point is that, without the addition of such a mandate, § 160A–300.1 is not otherwise subject to the requirement.

Guilford County Board of Education's Motion for Summary Judgment and, in so doing, respond to the Board's request for "a declaratory ruling as to whether the fines and other amounts received by the Defendants pursuant to N.C.G.S. § 160A–300.1 and High Point City Ordinance § 10–1–306 must be paid to the Guilford County Board of Education . . . ." (Answer and Request for Declaratory Judgment, at 13.) For the reasons previously stated, the Court's answer to the Board's question is that fines collected the by the City of High Point pursuant to City Ordinance § 10–1–306 are not required to be "appropriated and used exclusively for maintaining free public schools" in Guilford County. N.C. Const. art. IX, § 7.

## IV. CONCLUSION

For all the previously stated reasons, the Motion for Summary Judgment filed by the City Defendants and Peek [Document # 23] will be GRANTED IN PART to the extent that all claims against these Defendants will be dismissed, with the exception of Claims Three, Five, and Six which will be remanded to the state court for determination. The Motion for Summary Judgment filed by Defendants EDS and Pearson [Document # 27] will be GRANTED IN PART to the extent that all claims against these Defendants will be dismissed, with the exception of Claims Three, Five, and Six which will be remanded to the state court for determination. The Motion to Dismiss And/Or for Summary Judgment and Remand filed by the State of North Carolina [Document # 31] will be GRANTED as follows: the portion of the State's Motion requesting summary judgment against Claims One and Two will be GRANTED; the portion of the State's Motion requesting a remand of Claims Three, Five, and Six will also be GRANTED; the portion of the State's Motion requesting dismissal for failure to state a ground on which the statute may be inval-

id will be DENIED as moot, in light of the grant of the Motion's request for summary judgment. For all the same reasons, Plaintiff's Motion for Summary Judgment [Document # 34] will be DENIED in full.

Finally, Defendant Guilford County Board of Education's Motion for Partial Summary Judgment [Document # 21] and their specific Request for Declaratory Judgment [Document # 13] will both be DENIED. An Order and Judgment in accord with this Memorandum Opinion shall be filed contemporaneously herewith.

## ORDER AND JUDGMENT

For the reasons stated in the Memorandum Opinion filed contemporaneously herewith, the Motion for Summary Judgment filed by the City Defendants and Peek [Document # 23] is GRANTED IN PART to the extent that all claims against these Defendants are dismissed, with the exception of Claims Three, Five, and Six which will be remanded to the state court for determination. The Motion for Summary Judgment filed by Defendants EDS and Pearson [Document # 27] is GRANTED IN PART to the extent that all claims against these Defendants are dismissed, with the exception of Claims Three, Five, and Six which will be remanded to the state court for determination. The Motion to Dismiss And/Or for Summary Judgment and Remand filed by the State of North Carolina [Document # 31] is GRANTED as follows: the portion of the State's Motion requesting summary judgment against Claims One and Two is GRANTED; the portion of the State's Motion requesting a remand of Claims Three, Five, and Six is GRANTED; the portion of the State's Motion requesting dismissal for failure to state a ground on which the statute may be invalid is DENIED as moot, in light of the grant of the Motion's request for summary judgment. For all the same reasons,

Plaintiff's Motion for Summary Judgment [Document # 34] is DENIED in full. Finally, Defendant Guilford County Board of Education's Motion for Partial Summary Judgment [Document # 21] and their specific Request for Declaratory Judgment [Document # 13] are both DENIED.

Further, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Claims three, five, and six, as set forth in the Complaint in this action, are REMANDED to the General Court of Justice, Superior Court Division, Guilford County, North Carolina.